## FUNK v. UNITED STATES.

No. 394. Argued November 13, 14, 1933.—Decided December 11, 1933.

*Mr. John W. Carter, Jr.,* with whom *Mr. Charles A. Hammer* was on the brief, for petitioner.

*Assistant Solicitor General MacLean,* with whom *Solicitor General Biggs* and *Messrs. A. W. W. Woodcock* and *W. Marvin Smith* were on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The sole inquiry to be made in this case is whether in a federal court the wife of the defendant on trial for a criminal offense is a competent witness in his behalf. Her competency to testify against him is not involved.

The petitioner was twice tried and convicted in a federal district court upon an indictment for conspiracy to violate the prohibition law. His conviction on the first trial was reversed by the circuit court of appeals upon a ground not material here. 46 F. (2d) 417. Upon the second trial, as upon the first, defendant called his wife to testify in his behalf. At both trials she was excluded upon the ground of incompetency. The circuit court of appeals sustained this ruling upon the first appeal, and also upon the appeal which followed the second trial. 66 F. (2d) 70. We granted certiorari, limited to the question as to what law is applicable to the determination of the competency of the wife of the petitioner as a witness.

Both the petitioner and the government, in presenting the case here, put their chief reliance on prior decisions of this court. The government relies on *United States* v. *Reid,* 12 How. 361; *Logan* v. *United States,* 144 U.S. 263; *Hendrix* v. *United States,* 219 U.S. 79; and *Jin Fuey Moy*

v. *United States*, 254 U.S. 189. Petitioner contends that these cases, if not directly contrary to the decisions in *Benson* v. *United States*, 146 U.S. 325, and *Rosen* v. *United States*, 245 U.S. 467, are so in principle. We shall first briefly review these cases, with the exception of the *Hendrix* case and the *Jin Fuey Moy* case, which we leave for consideration until a later point in this opinion.

In the *Reid* case, two persons had been jointly indicted for a murder committed upon the high seas. They were tried separately, and it was held that one of them was not a competent witness in behalf of the other who was first tried. The trial was had in Virginia; and by a statute of that state passed in 1849, if applicable in a federal court, the evidence would have been competent. Section 34 of the Judiciary Act of 1789 declares that the laws of the several states, except where the Constitution, treaties or statutes of the United States otherwise provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply; but the court said that this referred only to civil cases and did not apply in the trial of criminal offenses against the United States. It was conceded that there was no act of Congress prescribing in express words the rule by which the federal courts would be governed in the admission of testimony in criminal cases. " But," the court said (p. 363), " we think it may be found with sufficient certainty, not indeed in direct terms, but by necessary implication, in the acts of 1789 and 1790, establishing the courts of the United States, and providing for the punishment of certain offences."

The court pointed out that the Judiciary Act regulated certain proceedings to be had prior to impaneling the jury, but contained no express provision concerning the mode of conducting the trial after the jury was sworn, and prescribed no rule in respect of the testimony to be taken. Obviously however, it was said, some certain and

established rule upon the subject was necessary to enable the courts to administer the criminal jurisprudence of the United States, and Congress must have intended to refer them to some known and established rule "which was supposed to be so familiar and well understood in the trial by jury that legislation upon the subject would be deemed superfluous. This is necessarily to be implied from what these acts of Congress omit, as well as from what they contain." (p. 365.) The court concluded that this could not be the common law as it existed at the time of the emigration of the colonists, or the rule which then prevailed in England, and [therefore] the only known rule which could be supposed to have been in the mind of Congress was that which was in force in the respective states when the federal courts were established by the Judiciary Act of 1789. Applying this rule, it was decided that the witness was incompetent.

In the *Logan* case it was held that the competency of a witness to testify in a federal court sitting in one state, was not affected by his conviction and sentence for felony in another state; and that the competency of another witness was not affected by his conviction of felony in a Texas state court, where the witness had since been pardoned. The indictment was for an offense committed in Texas and there tried. The decision was based not upon any statute of the United States, but upon the ground that the subject " is governed by the common law, which, as has been seen, was the law of Texas . . . at the time of the admission of Texas into the Union as a State." (p. 303.)

We next consider the two cases upon which petitioner relies. In the *Benson* case two persons were jointly indicted for murder. On motion of the government there was a severance, and Benson was first tried. His codefendant was called as a witness on behalf of the government. The *Reid* case had been cited as practically de-

cisive of the question. But the court, after pointing out what it conceived to be distinguishing features in that case, said (p. 335), "We do not feel ourselves, therefore, precluded by that case from examining this question in the light of general authority and sound reason." The alleged incompetency of the codefendant was rested upon two reasons, first, that he was interested, and second, that he was a party to the record, the basis for the exclusion at common law being fear of perjury. "Nor," the court said, "were those named the only grounds of exclusion from the witness stand; conviction of crime, want of religious belief, and other matters were held sufficient. Indeed, the theory of the common law was to admit to the witness stand only those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest. The courts were afraid to trust the intelligence of jurors. But the last fifty years have wrought a great change in these respects, and to-day the tendency is to enlarge the domain of competency and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion. This change has been wrought partially by legislation and partially by judicial construction." Attention then is called to the fact that Congress in 1864 had enacted that no witness should be excluded from testifying in any civil action, with certain exceptions, because he was a party to or interested in the issue tried; and that in 1878 (c. 37, 20 Stat. 30) Congress made the defendant in any criminal case a competent witness at his own request. The opinion then continues (p. 337):

"Legislation of similar import prevails in most of the States. The spirit of this legislation has controlled the decisions of the courts, and steadily, one by one, the merely technical barriers which excluded witnesses from the stand have been removed, till now it is generally,

though perhaps not universally, true that no one is excluded therefrom unless the lips of the originally adverse party are closed by death, or unless some one of those peculiarly confidential relations, like that of husband and wife, forbids the breaking of silence.

". . . If interest and being party to the record do not exclude a defendant on trial from the witness stand, upon what reasoning can a codefendant not on trial, be adjudged incompetent? "

That case was decided December 5, 1892. Twenty-five years later this court had before it for consideration the case of *Rosen* v. *United States, supra.* Rosen had been tried and convicted in a federal district court for conspiracy. A person jointly indicted with Rosen, who had been convicted upon his plea of guilty, was called as a witness by the government and allowed to testify over Rosen's objection. This court sustained the competency of the witness. After saying that while the decision in the *Reid* case had not been specifically overruled, its authority was seriously shaken by the decisions in both the *Logan* and *Benson* cases, the court proceeded to dispose of the question, as it had been disposed of in the *Benson* case, " in the light of general authority and sound reason."

" In the almost twenty [twenty-five] years," the court said [pp. 471, 472], " which have elapsed since the decision of the *Benson Case,* the disposition of courts and of legislative bodies to remove disabilities from witnesses has continued, as that decision shows it had been going forward before, under dominance of the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent, with

the result that this principle has come to be widely, almost universally, accepted in this country and in Great Britain.

" Since the decision in the *Benson Case* we have significant evidence of the trend of congressional opinion upon this subject in the removal of the disability of witnesses convicted of perjury, Rev. Stats., § 5392, by the enactment of the Federal Criminal Code in 1909 with this provision omitted and § 5392 repealed. This is significant, because the disability to testify, of persons convicted of perjury, survived in some jurisdictions much longer than many of the other common-law disabilities, for the reason that the offense concerns directly the giving of testimony in a court of justice, and conviction of it was accepted as showing a greater disregard for the truth than it was thought should be implied from a conviction of other crime.

" Satisfied as we are that the legislation and the very great weight of judicial authority which have developed in support of this modern rule, especially as applied to the competency of witnesses convicted of crime, proceed upon sound, principle, we conclude that the 'dead hand of the common-law rule of 1789 should no longer be applied to such cases as we have here, and that the ruling of the lower courts on this first claim of error should be approved."

It is well to pause at this point to state a little more concisely what was held in these cases. It will be noted, in the first place, that the decision in the *Reid* case was not based upon any express statutory provision. The court found from what the congressional legislation omitted to say, as well as from what it actually said, that in establishing the federal courts in 1789 some definite rule in respect of the testimony to be taken in criminal cases must have been in the mind of Congress; and the rule which the court thought was in the mind of that body was that of the common law as it existed in the thirteen original

states in 1789. The *Logan* case in part rejected that view and held that the controlling rule was that of the common law in force at the time of the admission of the state in which the particular trial was had. Taking the two cases together, it is plain enough that the ultimate doctrine announced is that in the taking of testimony in criminal cases, the federal courts are bound by the rules of the common law as they existed at a definitely specified time in the respective states, unless Congress has otherwise provided.

With the conclusion that the controlling rule is that of the common law, the *Benson* case and the *Rosen* case do not conflict; but both cases reject the notion, which the two earlier ones seem to accept, that the courts, in the face of greatly changed conditions, are still chained to the ancient formulae and are powerless to declare and enforce modifications deemed to have been wrought in the common law itself by force of these changed conditions. Thus, as we have seen, the court in the *Benson* case pointed to the tendency during the preceding years to enlarge the domain of competency, significantly saying that the changes had been wrought not only by legislation but also " partially by judicial construction "; and that it was the *spirit* (not the *letter*, be it observed) of this legislation which had controlled the decisions of the courts and steadily removed the merely technical barriers in respect of incompetency, until generally no one was excluded from giving testimony, except under certain peculiar conditions which are set forth. It seems difficult to escape the conclusion that the specific ground upon which the court there rested its determination as to the competency of a codefendant was that, since the defendant had been rendered competent, the competency of the codefendant followed as a natural consequence.

This view of the matter is made more positive by the decision in the *Rosen* case. The question of the testi-

monial competency of a person jointly indicted with the defendant was disposed of, as the question had been in the *Benson* case, " in the light of general authority and sound reason." The conclusion which the court reached was based not upon any definite act of legislation, but upon the trend of congressional opinion and of legislation (that is to say of legislation generally), and upon the great weight of judicial authority which, since the earlier decisions, had developed in support of a more modern rule. In both cases the court necessarily proceeded upon the theory that the resultant modification which these important considerations had wrought in the rules of the old common law was within the power of the courts to declare and make operative.

That the present case falls within the principles of the *Benson* and *Rosen* cases, and especially of the latter, we think does not reasonably admit of doubt.

The rules of the common law which disqualified as witnesses persons having an interest, long since, in the main, have been abolished both in England and in this country; and what was once regarded as a sufficient ground for excluding the testimony of such persons altogether has come to be uniformly and more sensibly regarded as affecting the credit of the witness only. Whatever was the danger that an interested witness would not speak the truth—and the danger never was as great as claimed—its effect has been minimized almost to the vanishing point by the test of cross-examination, the increased intelligence of jurors, and perhaps other circumstances. The modern rule which has removed the disqualification from persons accused of crime gradually came into force after the middle of the last century, and is today universally accepted. The exclusion of the husband or wife is said by this court to be based upon his or her interest in the event. *Jin Fuey Moy* v. *United States, supra.* And whether by this is meant a practical interest in the result of the prosecution

or merely a sentimental interest because of the marital relationship, makes little difference. In either case, a refusal to permit the wife upon the ground of interest to testify in behalf of her husband, while permitting him, who has the greater interest, to testify for himself, presents a manifest incongruity.

Nor can the exclusion of the wife's testimony, in the face of the broad and liberal extension of the rules in respect of the competency of witnesses generally, be any longer justified, if it ever was justified, on any ground of public policy. It has been said that to admit such testimony is against public policy because it would endanger the harmony and confidence of marital relations, and, moreover, would subject the witness to the temptation to commit perjury. Modern legislation, in making either spouse competent to testify in behalf of the other in criminal cases, has definitely rejected these notions, and in the light of such legislation and of modern thought they seem to be altogether fanciful. The public policy of one generation may not, under changed conditions, be the public policy of another. *Patton* v. *United States,* 281 U.S. 276, 306.

The fundamental basis upon which all rules of evidence must rest—if they are to rest upon reason—is their adaptation to the successful development of the truth. And since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion, it may

have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past? That this court has the power to do so is necessarily implicit in the opinions delivered in deciding the *Benson* and *Rosen* cases. And that implication, we think, rests upon substantial ground. The rule of the common law which denies the competency of one spouse to testify in behalf of the other in a criminal prosecution has not been modified by congressional legislation; nor has Congress directed the federal courts to follow state law upon that subject, as it has in respect of some other subjects. That this court and the other federal courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt.

In *Hurtado* v. *California*, 110 U.S. 516, 530, this court, after suggesting that it was better not to go too far back into antiquity for the best securities of our liberties, said:

" It is more consonant to the true philosophy of our historical legal institutions to say that the spirit of personal liberty and individual right, which they embodied, was preserved and developed by a progressive growth and wise adaptation to new circumstances and situations of the forms and processes found fit to give, from time to time, new expression and greater effect to modern ideas of self-government.

" This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law.

". . . and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms."

Compare *Holden* v. *Hardy,* 169 U.S. 366, 385–387.

To concede this capacity for growth and change in the common law by drawing " its inspiration from every fountain of justice," and at the same time to say that the courts of this country are forever bound to perpetuate such of its rules as, by every reasonable test, are found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a " flexibility and capacity for growth and adaptation " which was " the peculiar boast and excellence " of the system in the place of its origin.

The final question to which we are thus brought is not that of the power of the federal courts to amend or repeal any given rule or principle of the common law, for they neither have nor claim that power, but it is the question of the power of these courts, in the complete absence of congressional legislation on the subject, to declare and effectuate, upon common law principles, what is the present rule upon a given subject in the light of fundamentally altered conditions, without regard to what has previously been declared and practiced. It has been said so often as t▫ have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions. In *Ketelsen* v. *Stilz,* 184 Ind. 702; 111 N.E. 423, the supreme court of that state, after pointing out that the common law of England was based upon usages, customs and institutions of the English

people as declared from time to time by the courts, said (p. 707):

"The rules so deduced from this system, however, were continually changing and expanding with the progress of society in the application of this system to more diversified circumstances and under more advanced periods. The common law by its own principles adapted itself to varying conditions and modified its own rules so as to serve the ends of justice as prompted by a course of reasoning which was guided by these generally accepted truths. One of its oldest maxims was that where the reason of a rule ceased, the rule also ceased, and it logically followed that when it occurred to the courts that a particular rule had never been founded upon reason, and that no reason existed in support thereof, that rule likewise ceased, and perhaps another sprang up in its place which was based upon reason and justice as then conceived. No rule of the common law could survive the reason on which it was founded. It needed no statute to change it but abrogated itself."

That court then refers to the settled doctrine that an adoption of the common law in general terms does not require, without regard to local circumstances, an unqualified application of all its rules; that the rules, as declared by the English courts at one period or another, have been controlling in this country only so far as they were suited to and in harmony with the genius, spirit and objects of American institutions; and that the rules of the common law considered proper in the eighteenth century are not necessarily so considered in the twentieth. "Since courts have had an existence in America," that court said (p. 708), "they have never hesitated to take upon themselves the responsibility of saying what are the proper rules of the common law."

And the Virginia Supreme Court of Appeals, in *Hanriot v. Sherwood*, 82 Va. 1, 15, after pointing to the fact that

the common law of England is the law of that common-wealth except so far as it has been altered by statute, or so far as its principles are inapplicable to the state of the country, and that the rules of the common law had under-gone modification in the courts of England, notes with obvious approval that " the rules of evidence have been in the courts of this country undergoing such modification and changes, according to the circumstances of the coun-try and the manner and genius of the people."

The supreme court of Connecticut, in *Beardsley* v. *Hartford,* 50 Conn. 529, 541–542, after quoting the maxim of the common law, *cessante ratione legis, cessat ipsa lex,* said:

" This means that no law can survive the reasons on which it is founded. It needs no statute to change it; it abrogates itself. If the reasons on which a law rests are overborne by opposing reasons, which in the progress of society gain a controlling force, the old law, though still good as an abstract principle, and good in its applica-tion to some circumstances, must cease to apply as a controlling principle to the new circumstances."

The same thought is expressed in *People* v. *Randolph,* 2 Park. Cr. Rep. (N.Y.) 174, 177:

" Its rules [the rules of the common law] are modified upon its own principles and not in violation of them. Those rules being founded in reason, one of its oldest maxims is, that where the reason of the rule ceases the rule also ceases."

It was in virtue of this maxim of the common law that the supreme court of Nevada, in *Reno Smelting Works* v. *Stevenson,* 20 Nev. 269; 21 Pac. 317, in a well reasoned opinion, held that the common law doctrine of riparian rights was unsuited to conditions prevailing in the arid land states and territories of the west, and therefore was without force in Nevada; and that, in respect of the use of water, the applicable rule was based upon the doctrine of prior appropriation for a beneficial use.

In Illinois it was held at an early day that the rule of the common law which required an owner of cattle to keep them upon his own land was not in force in that state, notwithstanding its adoption of the common law of England, being unsuited to conditions there in view of the extensive areas of land which had been left open and unfenced and devoted to grazing purposes. *Seeley* v. *Peters,* 5 Gil. (Ill.) 130.

Numerous additional state decisions to the same effect might be cited; but it seems unnecessary to pursue the matter at greater length.

It results from the foregoing that the decision of the court below, in holding the wife incompetent, is erroneous. But that decision was based primarily upon *Hendrix* v. *United States* and *Jin Fuey Moy* v. *United States, supra,* and in fairness to the lower court it should be said that its decision was fully supported by those cases.

In the *Hendrix* case the opinion does not discuss the point; it simply recites the assignment of error to the effect that the wife of Hendrix had not been allowed to testify in his behalf, and dismisses the matter by the laconic statement, " The ruling was not error." In the *Jin Fuey Moy* case it was conceded at the bar that the wife was not a competent witness for all purposes, but it was contended that her testimony was admissible in that instance because she was offered not in behalf of her husband, that is not to prove his innocence, but simply to contradict the testimony of government witnesses who had testified to certain matters as having transpired in her presence. The court held the distinction to be without substance, as clearly it was, and thereupon disposed of the question by saying that the rule which excludes a wife from testifying for her husband is based upon her interest in the event and applies without regard to the kind of testimony she might give. The point does not seem to have been considered by the lower court to which the writ of error was addressed (253 Fed. 213); nor, as plainly appears, was the real point as it is here involved presented

in this court. The matter was disposed of as one "hardly requiring mention." Evidently, the point most in the mind of the court was the distinction relied upon, and not the basic rule which was not contested. Both the *Hendrix* and *Jin Fuey Moy* cases are out of harmony with the *Rosen* and *Benson* cases and with the views which we have here expressed. In respect of the question here under review, both are now overruled.

*Judgment reversed.*

MR. JUSTICE CARDOZO concurs in the result.

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER are of opinion that the judgment of the court below is right and should be affirmed.