**UNITED STATES of America,
Plaintiff,**

v.

**GENERAL DOUGLAS MacARTHUR
SENIOR VILLAGE, INC., et al.,
Defendants.**

**No. 71–C–1023.**

United States District Court,
E. D. New York.

Feb. 3, 1972.

Robert A. Morse, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for plaintiff; Joseph Rosenzweig, Asst. U. S. Atty., of counsel.

Michael P. Gurlides, Mineola, N. Y., for Estate of David Rand.

Schiffmacher, Rochford & Cullen, Great Neck, N. Y., for defendant D. C. R. Holding Corp.; C. Ellis Schiffmacher, John M. Farrell, Jr., Great Neck, N. Y., of counsel.

Howard E. Levitt, Town Atty., Hempstead, N. Y., for defendant Town of Hempstead; Daniel P. McCarthy, Asst. Town Atty., of counsel.

Stanley Beals, Jericho, N. Y., for defendant Sadie Schwartz.

Joseph Jaspen, County Atty. of Nassau County, Mineola, N. Y., for defendant County of Nassau; Louis A. Rossano, Deputy County Atty., of counsel.

Saul Horowitz, Corp. Counsel, Inc. Village of Hempstead, Hempstead, N. Y., for defendant Village of Hempstead.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This is an action to foreclose a mortgage held by the Secretary of Housing and Urban Development on real property located in Hempstead, New York. 28 U.S.C. § 1345. Plaintiff's motion for summary judgment presents a dispositive legal issue of some importance to financially pressed municipalities: are liens for local taxes arising and accruing subsequent to the recording of a federally-held mortgage superior to the mortgage lien? For the reasons stated below, the answer is yes.

## I.

### FACTS

The relevant facts are uncontested. General Douglas MacArthur Senior Village, Inc. (the mortgagor) is a membership corporation chartered by the State of New York to provide non-profit rental housing and related facilities and services for elderly persons. In April 1966, pursuant to the authority of section 202 of the Federal Housing Act of 1959 (12 U.S.C. § 1701q), the Secretary of Housing and Urban Development loaned the mortgagor $1,774,000 for use in the construction of facilities for senior citizens. As security, a first mortgage on the property was taken and duly recorded.

Local taxes assessed by the County of Nassau, the Town of Hempstead, and the Village of Hempstead were not paid by the mortgagor. Treating this failure as a default, the government foreclosed. Over $1,500,000.00 is owed on the federal mortgage. Unpaid real property taxes aggregate approximately $200,000.

## II.

Particularly awkward issues are raised when competing creditors are governmental bodies. One group seeks protection for its power to tax in order to provide essential services for the local community. The other one demands protection for funds it has expended for the general welfare of the nation.

▇ Were the mortgage held by a private party, the mortgage lien would be inferior, under New York law, to that for local taxes. N. Y. Real Property Actions and Proceedings Law, § 1354, McKinney's Consol.Laws c. 81. Because federal property and taxing rights are involved, the superior constitutional sovereignty of the United States compels application of federal law. *Cf.* Aquilino v. United States, 363 U.S. 509, 514–515, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

While federal law is not clear, we conclude that, like New York law, it affords the local tax liens priority. This conclusion is based on two separate grounds.

An independent common law basis in public policy as revealed by statutory enactments is discussed in Part III. A second reason for decision, contained in Part IV, is premised on interpretation of certain provisions of chapter 13 of title 12 of the United States Code designed to waive any federal priority in situations such as the one before us. A statutory hiatus and sparse legislative history requires an extensive analysis to explain this conclusion. The statutory interpretation argument in Part IV is divided into two sections—section A deals with the specific language of chapter 13 of Title 12 of the United States Code, and section B with treatment of related situations.

## III.

The United States argues that the priority of federal liens as against liens created under state law is governed by the choate lien test; i. e., the rule that "the first in time is the first in right." United States v. City of New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954) ; City of New Brunswick v. United States, 276 U.S. 547, 48 S.Ct. 371, 72 L.Ed. 693 (1928) (mortgage interest held by United States). If that rule were enforced, the federal government's mortgage lien, arising as it did prior to the assessment of any of the relevant local taxes, would have priority.

The vitality of the "first in time" rule in connection with local tax liens has been sufficiently eroded by legislative action subsequent to its judicial origin to obviate the necessity for applying it here. Congress has specifically waived any priority the federal government might otherwise have in relation to state and local taxes in numerous instances. *See, e. g.,* 12 U.S.C. §§ 1706b, 1714, 1741, 1747j and 1750e; 15 U.S.C. § 646. It has been recognized that there has been a consistent tendency "to waive tax exemption on real property owned by government corporations whose functions were primarily financial in nature." Rohr Aircraft Corp. v. County of San Diego, 362 U.S. 628, 630–631, 80 S.Ct. 1050,

1052, 4 L.Ed.2d 1002 (1960). Most significantly, Congress has enacted a sweeping reform of the law of federal liens in the form of the Federal Tax Lien Act of 1966, the effect of which must be recognized even in areas not expressly covered by its terms.

Federal tax liens were in 1966 declared to be inferior to liens for local taxes "of general application levied by any taxing authority based upon the value of [real] property." 26 U.S.C. § 6323(b) (6) (A). Plaintiff contends that the fact that Congress has expressly waived federal priority in the area of its taxing power— where its claim to sovereign priority is certainly of the highest order—is immaterial to the question of whether there has been an implied waiver in areas where the federal government's claim arises from its activities of a more private nature.

The financial position of local governments has steadily deteriorated in recent years. They are squeezed between a proportionally diminishing tax base and rising disbursements. *See, e. g.,* R. W. Bahl, State Taxes, Expenditures, and the Fiscal Plight of the Cities, in The American Assembly, Columbia University, The States and the Urban Crisis, 85 (A. K. Campbell, ed. 1970); A. Pecker, Property Tax Problems Confronting State and Local Governments, in H. Johnson, State and Local Tax Problems 39 (1969); J. Maxwell, Financing State and Local Governments, Brookings Institution Studies of Government Finance No. 10 (1965); Meyers, Tax-Exempt Property: Crushing Burden for the Cities, Fortune, May 1, 1967, at 76. An appreciable complication has been the increase in tax-exempt property attributable to the entry of the federal government into traditionally private areas of commercial activity. In 1880 only 4.6% of all real property was exempt from taxation. The figure has risen to 32.6% by 1968, with an even higher percentage in many urban areas. Meyers, *supra,* at 79. At the same time, total state and local government expenditures for such essential services as education, roads, welfare, public health, hospitals, police, recreation and sanitation exceed twice the federal government's budget for civilian services and grow by exponential rates. Maxwell, *supra,* at 1.

Some 80,000 local governmental bodies depend upon property taxes to supply, on the average, seven-eighths of their revenues. U. S. Advisory Commission on Intergovernmental Relations, The Role of the States in Strengthening the Property Tax iii (1963). As has been observed at the highest levels of federal government, the consequence has been that real property taxes paid by the average citizen have doubled over the last decade and become "one of the most oppressive and discriminatory of all taxes, hitting most cruelly at the elderly and the retired." President's Address on the State of the Union to a Joint Session of Congress, N. Y. Times, Jan. 21, 1972, at 18.

In recognition of the financial plight of local governments, the American Bar Association Special Committee on Federal Liens concluded that federal tax claims should be inferior to state and local tax liens on real property. Report of the Special Committee on Federal Liens, 84 A.B.A.Rep. 645, 661 (1959). The recommendation was adopted by Congress in the Federal Tax Lien Act of 1966. 26 U.S.C. § 6323(b) (6) (A).

Although the Special Committee on Federal Liens, because of limited time and resources, confined its studies to federal tax matters, the reports of the United States Advisory Commission on Intergovernmental Relations indicate that federal exemption from local property taxes would be even less appropriate where the federal government has engaged in commercial operations. The Commission has repeatedly advised state and local governments that their solvency depends in part on their effective enforcement of property taxes on a uniform basis. *See, e. g.,* U. S. Advisory Commission on Intergovernmental Relations, State and Local Finances 3 (1969); U. S. Advisory Commission on Intergovernmental Relations, Fiscal Balance in the

American Federal System 20 (1967). It has specifically cautioned local governments to avoid "frittering away the tax base" through exemptions which instead could be made direct and visible subsidies. U. S. Advisory Commission on Intergovernmental Relations, The Role of the States in Strengthening the Property Tax 87 (1963). An exemption for the federal government as mortgagee in this instance would be wholly inconsistent with this policy.

Responsible commentators and judges, dissatisfied with the "first in time" rule, have uniformly indicated that federal priority is not merited where federal non-tax claims are involved:

> "[I]f the 'imperious need' for raising tax revenue is no longer thought to demand maintenance of unconscionable rules of priority, *a fortiori* should not those rules be abandoned when the Government 'step[s] down from that place of sovereignty to enter the domain of business and commerce,' as a lender or guarantor of loans or as a seller of property?" Plumb, Jr., Federal Liens and Priorities—Agenda for the Next Decade, 77 Yale L.J. 228, 292 (1967).

As one judge explained in a decision prior to the 1966 Act, the equities strongly favored the localities, but then national policy prevented a fair result:

> "In granting priority to the [federal] mortgage, I am not unmindful of the several equities in favor of the municipality. In fact, it is only the weight of the superior decisional authority that has led me to the conclusion reached herein. The court is very much aware of the fact that since 1931 the national government embarked on a policy of making loans on various sorts of security. In no area was it more active than in the mortgage market. I am unable to see how such transactions differ from those between private parties. The explanation of sovereignty appears too unsatisfactory. . . . When a local government provides police and fire protection, health and education facilities, and water sup-

ply, all of which enhance the value of property within its jurisdiction, 'it is only an ordinary and legal exertion of government to provide means for its compulsory compensation.'" United States v. Ringwood Iron Mines, 151 F. Supp. 421, 426 (D.N.J.), aff'd, 251 F. 2d 145 (3d Cir. 1957), cert. denied, 356 U.S. 974, 78 S.Ct. 1138, 2 L.Ed.2d 1148 (1958).

After enactment of the Federal Tax Lien Act of 1966, the Court of Appeals for the Fifth Circuit indicated that the "first in time" rule need no longer be rigidly applied. Connecticut Mutual Life Insurance Co. v. Carter, 446 F.2d 136 (5th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971). Through the Farmers Home Administration (FHA), the federal government held a second mortgage on a Florida citrus farm as security for the extension of agricultural credit. The FHA took the second mortgage aware that the Connecticut Mutual Life Insurance Company held a prior mortgage on the property requiring payment of attorneys' fees by the mortgagor in the event of default on the underlying obligation. The FHA contended that its claim was superior to the lien for attorneys' fees on the grounds that, since the amount of attorneys' fees was not choate (specific and certain) when the FHA mortgage attached, the non-federal lien was not "first in time."

This argument was rejected on the grounds that the Federal Tax Lien Act of 1966 had substantially altered the common law rule:

> "Although the 1966 amendment does not of itself affect the priority of the claims here involved, the statute diminishes the validity of the choate lien test in the important field of taxation where the doctrine originated. It would indeed be anomalous and contrary to our view of congressional intent to allow the FHA operating as a money-lending agency to prevail in a situation where the government as holder of a tax lien would have an inferior security interest. The collection of taxes is certainly more vital to the

government's existence than the making of farm loans and if Congress determines (as it has) that a federal tax lien, involuntarily imposed upon the government, is not unduly threatened by an inchoate lien for attorneys' fees, then we see no reason to exempt a federal mortgage lien, which the government sought to obtain, from the operation of a provision for attorneys' fees in a first mortgage." 446 F.2d at 139 (citations and footnote omitted).

If the Federal Tax Lien Act of 1966 affords a basis for reconsideration of federal non-tax priority where the competing creditor is a private party, it requires no less for local governmental bodies.

■ None of the reasons commonly suggested as supporting a restrictive approach to the role of statutory law in judicial decision-making are applicable here. *Cf.* Agsten v. Huntington Trust and Savings Bank, 388 F.2d 156, 160 (4th Cir. 1967), cert. denied, 390 U.S. 1025, 80 S.Ct. 1413, 20 L.Ed.2d 282 (1968). The argument that courts should hesitate to rely upon principles patently implicit in a given statute, in a manner that courts expand upon decisional law, is premised primarily on two theories: first, that such judicial deference is proper in light of the legislature's superior resources for fact gathering; and, second, that explicit legislative solutions are less likely to run counter to the popular will. *See* Friendly, The Gap in Lawmaking—Judges Who Can't and Legislators Who Won't, 63 Colum.L.Rev. 787, 791–92 (1963).

In this instance, the years of scholarly research by the American Bar Association Special Committee on Federal Liens and the extensive consideration of the Federal Tax Lien Act of 1966 by Congress resulted in a policy decision that, even where the federal government's claim to sovereign priority is strongest, the public interest is better served by protecting the tax base of local government. *See, e. g.,* Plumb, Jr., Federal Liens and Priorities—Agenda for the Next Decade, 77 Yale L.J. 228 (1967);

Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905 (1954); Report of the Special Committee on Federal Liens, 84 A.B.A.Rep. 645, 661 (1957). To apply that policy where the government has acted substantially as a private lender is to recognize Congressional policy and the extended empirical basis for it. Failure to do so would constitute blatant disregard for the considered decision of elected representatives.

■ Particularly inappropriate is the argument that the courts should refrain from harrowing fields which Congress has plowed on the grounds that judges are less sensitive to popular control. The question of lien priority is unlikely to be the kind of burning issue on which legislative seats are won or lost. Given the choice between applying an outdated rule of federal common law or a rule suggested by the general trend of congressional policy in closely related areas, the latter result has the approval of the Supreme Court. As it told us in Funk v. United States, 290 U.S. 371, 381–382, 54 S.Ct. 212, 215, 78 L.Ed. 369 (1933):

> "It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion it may have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but, if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present-day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past?"

■■ We reach this result aware of the special considerations mandated by the doctrine of McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819). Although no specific provision

of the Constitution forbids taxation of the federal government by the state without its consent, there is implied in the federal government's power to establish agencies to carry on its business a power to preclude taxation of those agencies by the states. The states are not free, absent a congressional waiver, to tax the operation of institutions and agencies of the United States since the power unrestrainedly to do so would be the power to destroy them.

The *McCulloch* doctrine need not be distorted by extending it beyond its reason for being. There is a certain degree of unreality to rhetoric about the power to tax being the power to destroy when what is involved is a local real property tax applicable to all but exempt real property. In holding a tax imposed by the State of Maryland upon the Bank of the United States unconstitutional, the Court noted that local taxes on real property of the bank were not forbidden:

> "This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state." 17 U.S. at 436.

The scope of the necessary constitutional exemption was further clarified in Thompson v. Pacific Railroad, 76 U.S. 579, 590, 19 L.Ed. 792 (1869), where, in ruling on the local tax status of railroads incorporated under state law but constructing the transcontinental railway under the direction and authority of Congress, the Court again explained that *McCulloch* did not preclude taxes on real property required to support local governmental services:

> "The State tax held to be repugnant to the Constitution was imposed directly upon an operation or an instrument of the government. That such taxes cannot be imposed on the operations of the government, is a proposition which

needs no argument to support it. And the same reasoning will apply to instruments of the government, created by itself for public and constitutional ends. But we are not aware of any case in which the real estate, or other property of a corporation not organized under an Act of Congress, has been held to be exempt, in the absence of express legislation to that effect, to just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the government."

Nothing in the *McCulloch* line of cases requires a niggardly interpretation of a sound and generous national policy against reducing the local property tax base by federal programs designed to aid those localities.

### IV.

Alternatively, the same result—that the local tax liens must be afforded priority—might be reached by a close examination of federal statutory law. Some of the difficulty in analysis results from an ambiguity caused by a failure to distinguish between a mortgage and the underlying property; the mortgage instrument is a security, but it creates a property right in the form of an equitable interest in the property. Here the government held the mortgage, giving it an interest in the real property owned by the mortgagor, but the taxes were levied on the real property fee interest of the mortgagor and not on the mortgage interest of the government mortgagee.

### A

#### STATUTORY LANGUAGE

The argument is premised on the interrelationship of several provisions of various Acts of Congress—all dealing with the subject of housing generally—as they are presently set out in chapter 13 of title 12 of the United States Code. To understand the argument, it is necessary to examine the relevant provisions

in their statutory setting. Title 12 of the United States Code, while headed "Banks and Banking", deals with a broader subject matter in 19 chapters. For example, titles 7 to 10 cover aid to farmers and titles 11 to 13 deal with fiscal programs intended to encourage various kinds of housing. Chapter 13 is headed "National Housing." It contains ten subchapters ranging from "I. Housing Renovation and Modernization" to "X. National Defense Housing Insurance." It is cited as the "National Housing Act." 12 U.S.C. § 1701.

■ Section 1701q in chapter 13 is the source of the Secretary's authority to grant loans for the construction of housing for the elderly secured by mortgages such as the one before us. Peculiarly, this section is not in any of the ten subchapters of chapter 13; it was enacted as part of the Housing Act of 1959 and not as part of the National Housing Act which comprises most of chapter 13 of title 12. Pub.L. 86–372, Title II, § 202, Sept. 23, 1959, 73 Stat. 667. It is placed in the United States Code—apparently as prescribed by the Committee on Judiciary of the House of Representatives (1 U.S.C. § 205)—in the preliminary material before subchapter I of chapter 13 of title 12 with a variety of provisions dealing with housing research (12 U.S.C. § 1701d–3), development of new building codes (12 U.S.C. § 1701e), prefabricated housing (12 U.S.C. § 1701g–1), rent supplements to lower income families (§ 1701s), and other important housing programs. While little weight can be given to the positioning of section 1701q, there is some significance in the fact that a variety of amendments to this and other closely related sections were made after it was first printed in the United States Code. We examine the argument in some detail to show that at least it does not favor the government's position and because in its argument and briefs the government assumed its validity.

Despite the lack of formal symmetry in chapter 13, section 1701q seems designed by its draftsmen to be integrated, so far as possible, into provisions governing other parts of the national housing program. For example, references to "the Secretary" in subdivision (a) (2) means the Secretary of Housing and Urban Development (e. g., 12 U.S.C. §§ 1701c, 1702); there is explicit reference in subdivision (b) to powers of the Secretary under section 1749a of title 12 found in subchapter IX of chapter 13; subdivision (c) (2) makes various provisions of the National Housing Act of 1954 applicable; and subdivision (e) refers to prior commitments under section 1715v in subchapter II of title 12, covering insurance for elderly persons.

The legislative history of section 1701q reflects a like tendency to regard the several pieces of federal housing legislation as an integrated unit, evincing a common purpose and direction. Section 1701q is the codification of section 202 of the Housing Act of 1959, 73 Stat. 654. The Senate Report on the Housing Act of 1959 addresses itself to the commitment of the federal government, under earlier legislation, to assist local housing projects and states that the history of the bill would be best understood in light of the background of earlier federal programs. S.Rep. No. 924, 86th Cong., 1st Sess. (1959), U.S.Code Cong. & Admin. News 1959, p. 2844. Significantly, of the 70 sections contained in the Housing Act of 1959, only three sections enact totally new provisions of substantive law. The remainder refer to and amend provisions of prior legislation, chiefly in the National Housing Act, the United States Housing Act of 1937, the Housing Amendments of 1955, and the Housing Acts of 1949, 1950, 1954, 1956 and 1957. The Act was designated by Senator Sparkman, its sponsor in the Senate, as "comprehensive housing legislation." 105 Cong.Rec. 18751 (1959). Representative Lindsay of New York described it in the House as "a housing bill which would . . . keep alive the many fine aspects of the Federal housing program already in existence." 105 Cong.Rec. 18996 (1959).

■ The lack of parallel language in the myriad housing provisions, and the

absence of a recent recodification, suggest that the sense of Congress must be sought in the general legislative pattern. With this principle in mind, we turn to the particular language bearing on our problem.

Section 1701q, governing housing loans for the elderly, says nothing of tax priorities. They are mentioned in sections 1706b, 1714, 1741, 1747j and 1750e of title 12 of the United States Code, as made applicable to the present controversy, defendants contend, through section 1733 of title 12. Sections 1714, 1741, 1747j and 1750e are identical in giving priority to local taxes on real property. They read as follows:

> "Nothing in this subchapter shall be construed to exempt any real property acquired and held by the Secretary under this subchapter from taxation by any State or political subdivision thereof, to the same extent, according to its value, as other real property is taxed."

Section 1706b, while differing in language, reaches the same result:

> "Nothing in this subchapter shall be construed to exempt any real property acquired and held by the Commissioner in connection with the payment of insurance heretofore or hereafter granted under this subchapter from taxation by any State or political subdivision thereof, to the same extent, according to its value, as other real property is taxed."

The subchapter in title 12 U.S.C. to which section 1706b relates is "House Renovation and Modernization"; section 1714 is in the subchapter for "Mortgage Insurance"; section 1741 is in the subchapter which provides for "War Housing Insurance"; section 1747j relates to "Insurance For Investments In Rental Housing For Families Of Moderate Income"; and section 1750e is concerned with "National Defense Housing Insurance." It is significant that although not every subchapter in chapter 13 contains a federal disclaimer of priorities over taxes, no statutory provision in title 12 has been brought to our attention that is contrary to these sections.

One provision seems to mandate consistent treatment of mortgages issued under chapter 13. Section 1733 of title 12, in subchapter V of chapter 13, is entitled "Miscellaneous Provisions." It provides in part:

> "all . . . provisions of law establishing rights under mortgages insured in accordance with the provisions of this chapter, shall be held to apply to such chapter, as amended."

Defendants urge that sections 1706b, 1714, 1741, 1747j and 1750e, because they are in the same chapter as section 1733, are as applicable to the mortgage involved in this case as they would be to mortgages and liens arising from transactions in each of the subchapters in which those sections are contained.

While not disputing the applicability of these sections, the United States argues that Congress intended that the words "real property acquired and held" mean only property held in fee, and not property in which the Secretary's interest is that of a mortgagee. In support of this position it relies on McFeely v. Commissioner of Internal Revenue, 296 U.S. 102, 107, 56 S.Ct. 54, 56, 80 L.Ed. 83 (1935), where the Court stated:

> "In common understanding, to hold property is to own it. In order to own or hold one must acquire."

If any inference at all may be drawn from *McFeely*, it would be adverse to plaintiff. In *McFeely*, the Court faced the issues of whether, under the federal Revenue Act then in force, a taxpayer could claim the advantage of a sale of property as a capital asset—defined originally as "property acquired and held by the taxpayer . . . for more than two years"—where the property was acquired from a decedent through intestacy or by will, and the taxpayer had sold the property more than two years after the death of the decedent from whom title was derived but less than two years after actual distribution of the estate. Seeking to effectuate the intent

of Congress, the Court ruled that the date of death should govern, noting that, for this specific purpose, it was immaterial

"[w]hether under local law title to personal property passes from a decedent to the legatee or next of kin at death subject to a withholding of possession for purposes of administration, or passes to the personal representative for the purposes of administration." 396 U.S. at 108, 56 S.Ct. at 56.

The Court thus held that Congress, when it spoke of holding and acquiring property, had not sought to exclude from that definition an equitable interest merely because it did not include an immediate right to possession of the property, or because the interest was not uniformly recognized under state law.

■ The case at bar is analogous. While Congress did not define the words "real property acquired and held," the government's mortgagee interest in the fee should be treated as real property for tax priorities purposes in such sections as 1706b of title 12. In the words of one Congressman supporting related legislation, real property underlying a mortgage of a federal agency is "in the same category" as land used as security for a private mortgagee's loan. 76 Cong.Rec. 11390 (1934). History as well as policy confirm this view.

The earliest method of giving land as security for a loan was the gage of the twelfth and thirteenth centuries—a simple device by which the lender received absolute ownership of the property as full payment, subject only to the option of the other party to substitute some other form of payment at a later time. 3 R. Powell, Real Property, ¶¶ 438–39 (1970); 4 American Law of Property, G. E. Osborne on Mortgages, § 16.80 (Casner ed. 1952); Plucknett, Concise History of Common Law 540 (2d ed. 1936). Later, the basic mortgage transaction became the conveyance of a fee on condition subsequent, defeasance being based upon performance by the mortgagor. Still, title was immediately vested in the mortgagee. As late as the beginning of the seventeenth century it was unusual for the mortgagor to be left in possession of the property. 4 American Law of Property, supra, § 16.80. In any event, the mortgagee's position under English common law was that of a holder of real property. "He had the legal title and with it most, if not all, of the incidents that ordinarily go with it." Id. at § 16.9.

Jurisdictions in the United States have gone in three directions. In the so-called "title" states, the mortgagee has what in essence is a common law conveyance in fee on condition, but with most of the incidents of legal title except the right to take possession whittled away by judicial decisions finding them unnecessary to the security of the mortgagee. In the "hybrid" or "intermediate" states, the mortgagee, while theoretically holding title, lacks a right to possession until default or later. In the "lien" states, title remains in the mortgagor; the mortgagee's interest is essentially a lien or assurance of priority for his claim over general creditors protected by the power to compel sale. See generally id. at §§ 16.14–16.15; 3 R. Powell, Real Property, ¶ 439 (1970).

The result has been aptly summarized:

"The United States inherited this whole English law of mortgages, but has departed from it radically even in states which in form cling to it. The methods, kinds and degrees of departure, although they should be fundamentally easy to understand, have been so complex and diverse as to cause bewilderment to anyone who looks to them unrelated to their historical background." 4 American Law of Property, G. E. Osborne on Mortgages, § 16.13 (Casner ed. 1936).

Consistency even within the same jurisdiction has not been realized. In New York, for example, a so-called "lien" state, it has been said that a mortgage creates no estate in land, but is simply a "personal interest." Kortright v. Cady, 21 N.Y. 343 (1860). Nevertheless, a mortgage has been held to be a conveyance of an interest in real property for purposes of

compliance with the statute of frauds. N. Y. General Obligations Law, § 5–703, McKinney's Consol.Laws c. 24–A; Sleeth v. Sampsen, 237 N.Y. 69, 142 N.E. 355 (1923). Illustrative of the anomolies are cases such as Engel v. Tinker National Bank, 269 F.Supp. 199 (E.D.N.Y.1967) where a purchase money mortgagee held recorded title—a recognized practice in some areas of the state. *See also* City of New Brunswick v. United States, 276 U.S. 547, 48 S.Ct. 371, 72 L.Ed. 693 (1928). Practical recognition of the mortgagee's "ownership" interests are such rules as those that, to the extent of his lien, he has an interest in the real property sufficient to support a claim for a condemnation award. East River Savings Bank v. State, 266 App.Div. 494, 43 N.Y.S.2d 703 (3d Dep't 1943).

In interpreting section 1706b of title 12, applying New York law as a guide to understanding the meaning of "real property" as intended by Congress, the Appellate Division of the New York Supreme Court held a mortgage interest "real property" covered by the statutory waiver of priority. Dime Savings Bank of Brooklyn v. Beecher, 23 A.D.2d 297, 260 N.Y.S.2d 500, 504 (2d Dep't 1965), aff'd sub nom., Jamaica Savings Bank v. Williams, 18 N.Y.2d 763, 274 N.Y.S.2d 901 (1966). *See also* United States v. Springfield, 190 F.Supp. 817 (D.Mass.), aff'd, 294 F.2d 958 (1st Cir. 1961); Byram Holding Co. v. Bogren, 2 N.J. Super. 331, 63 A.2d 822 (1949).

State law is of significant aid in interpreting a federal standard. Masterson v. First Federal Sav. & L. Ass'n of Torrington, 53 F.R.D. 313, 316 (E.D.N.Y. 1971). As the Supreme Court has told us, at least in certain situations:

> "the Congressional purpose can best be accomplished by application of settled state rules as to what constitutes 'real property' so long as . . the state rules do not effect a discrimination against the government, or patently run counter to the terms of the Act." Reconstruction Finance Corp. v. Beaver County, Pa., 328 U.S. 204, 210,

66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946).

Nothing in this case suggests the need to ignore state experience in interpreting the phrase "real property" so as to give effect to a peculiar design of Congress, or to minimize uncertainty in interpretation of laws of the United States. *Cf.* Friendly, In Praise of Erie—And Of the New Federal Common Law, 39 N.Y.U.L. Rev. 383 (1964).

### B

### LEGISLATIVE HISTORY AND OTHER RELEVANT LEGISLATION

Congress supplied few extrinsic aids for ascertaining the intended scope of the phrase "real property." The 1934 draft of section 208 of H.R. 9620, presently codified as section 1714 of title 12 of the United States Code, provided the prototype for subsequently enacted sections 1706b, 1741, 1747j and 1750e of title 12, quoted above. Little consideration was apparently given to the scope or purpose of the mandate that real property held by the federal government not be exempted from state and local taxation. *See, e. g.,* H.R.Rep. No. 1922, 73d Cong., 2d Sess. (1934); H.R.Rep. No. 2066, 73d Cong., 2d Sess. (1934); 79 Cong.Rec. 11191–11224, 11363–11394 (1934).

Absent legislative history to the contrary, we cannot believe that Congress intended not to exempt from local taxation real property under the National Housing Act where title vests in the government, but to claim an exemption where the United States holds a mortgage lien. No plausible explanation has been given for Congress's wanting the rights of the United States to be greater when it holds a lesser interest than when it holds a fee interest. Dime Savings Bank of Brooklyn v. Beecher, 23 A.D.2d 297, 260 N.Y.S.2d 500, 506 (2d Dep't 1965), aff'd sub nom., Jamaica Savings Bank v. Williams, 18 N.Y. 763, 274 N.Y.S.2d 901 (1966).

Although decisional law on this point is not extensive, plaintiff has produced no

cases where "real property" as used in sections 1706b, 1714, 1741, 1747j or 1750e of title 12 of the United States Code has been construed to exclude a mortgagee lien on real property. None of the cases cited as favorable to plaintiff were decided on the basis of any relevant statute containing a waiver of the federal government's tax exemption. *See, e. g.,* United States v. Roessling, 280 F.2d 933 (5th Cir. 1960); United States v. Ringwood Iron Mines, 251 F.2d 145 (3d Cir. 1957), cert. denied, 356 U.S. 974, 78 S.Ct. 1138, 2 L.Ed.2d 1148 (1968); United States v. Davis Mining Enterprises, 187 F.Supp. 911 (W.D.Wis.1960), aff'd sub nom., United States v. County of Iowa, 295 F.2d 257 (7th Cir. 1961).

Support for this view is found in the nonexemption provision of the Small Business Administration Act that includes real property securing a mortgage. 15 U.S.C. § 646. *See, e. g.,* United States v. Consumers Scrap Iron Corporation, 384 F.2d 62 (6th Cir. 1967); United States v. Christensen, 218 F.Supp. 722 (D.Mont. 1963). Although the wording of the pertinent statute in those cases—section 646 of title 15 of the United States Code—varies from those under consideration insofar as it waives tax immunity as to "any interest held . . . in property," the legislative history reveals that this provision of the Small Business Administration Act was "designed to place SBA claims against borrowers in a subordinate position to the claims of State and local tax liens against such assets," and that the provision was thought to be *"consistent with other provisions of law."* Senate Rep. No. 1714, 85th Cong., 2d Sess., at 10 (1958), U.S.Code Cong. & Admin.News 1958, pp. 3071, 3080 (emphasis supplied).

We are persuaded to interpret the statutory sections before us in light of the spirit and purpose of section 646 of title 15 of the United States Code. That purpose was succinctly stated by Representative Payne on the floor of the House when he introduced the amendment to waive any exemption from local taxes:

"This modification is in accordance with custom and usage in this country where taxes have always taken precedence over debts. The fact that an agency of the United States is the creditor should not alter the situation. This legislation is necessary to clarify this debt precedence question and to assure fair treatment to states and localities where they must compete with the Small Business Administration for the remaining assets of the debtor." 104 Cong.Rec. 2470 (1958).

As already noted, we consider this entire line of argument, in Part IV, with some reservation in light of its partial dependence on the somewhat equivocal positioning of section 1701q in chapter 13 of title 12 of the United States Code. Nevertheless, a thorough review of the statutory provisions and their legislative history lends no support to plaintiff's position, and confirms our independent decision, expressed in Part III, *supra,* that the liens for local taxes must be afforded priority over federal non-tax claims because of the principles implicit in the Federal Tax Lien Act of 1966 and numerous instances of consistent legislation.

## V.

### CONCLUSION

The liens for unpaid local taxes will be afforded a priority over the mortgage lien held by the Secretary. Plaintiff will submit a judgment within five days.

So ordered.