Commonwealth *v.* Moore, Appellant.

Argued March 15, 1973. Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Carl M. Moses,* Assistant Public Defender, with him *Warren R. Keck, III,* Public Defender, for appellant.

*Robert F. Banks,* First Assistant District Attorney, with him *Joseph J. Nelson,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 19, 1973:
On December 10, 1970, the appellant, J. B. Moore, was convicted by a jury in Mercer County of voluntary

manslaughter. Post-trial motions were denied, and on June 29, 1972, Moore was sentenced to serve a term of imprisonment of not less than one and one-half and not more than three years in a state correctional institution. He was given credit for two hundred and nineteen days already served in the county jail. This appeal was then filed.

The prosecution followed the fatal shooting of one Ben Jones, in the living room of Moore's home.[1] Moore appeared intoxicated at the time[2] and no motive for the shooting was evident.

At the time of the occurrence, Moore's wife and Ernestine Kitt were in the kitchen of the house and did not witness the shooting. However, according to the trial testimony of Miss Kitt, who was called as a Commonwealth witness, both women rushed into the living room after hearing the shot and Mrs. Moore asked her husband, "why did you shoot Ben?" to which Moore replied "because he shot me."[3]

Testifying on his own behalf, Moore stated the gun discharged accidentally when Robert Pritchett who was also in the living room at the time "grabbed the gun." He also said he did not realize Jones was shot until some time later.

Mrs. Moore was not called as a witness by either side, and in his summation the district attorney was permitted, over objection, to argue to the jury that Moore's failure to call his wife as a witness permitted the jury to draw the inference her testimony would be

---

[1] A postdeath autopsy disclosed the fatal wound was caused by a bullet which entered the body between the third and fourth ribs and pierced the heart.

[2] A toxicology test after the shooting disclosed 230 milligrams of alcohol for 100 CC. of whole blood.

[3] A medical examination shortly after the occurrence disclosed Moore was suffering from a wound of the hand.

unfavorable to his defense. In his charge the trial judge also instructed the jury such an inference was permissible.

Generally, when a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not be merely cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference it would have been unfavorable. See McCormick, Law of Evidence, 534 (1954). See also *Bentivoglio v. Ralston,* 447 Pa. 24, 288 A. 2d 745 (1972), and *Commonwealth v. Wright,* 444 Pa. 536, 282 A. 2d 323 (1971). Accepting Mrs. Moore possessed information material to the issue instantly, the question remains, should this inference be permitted in a criminal case where the uncalled witness is the spouse of the defendant. We rule it should not.

In Pennsylvania a husband and wife are incompetent to testify against each other in a criminal trial except under certain limited circumstances, not relevant here. Act of May 23, 1887, P.L. 158, §2(b), as amended, 19 P.S. §683.[4] Under the facts of the instant case,

---

[4] The statute reads as follows:

"§683 Husband and Wife as witnesses against each other

"*Nor shall husband and wife be competent or permitted to testify against each other,* or in support of a criminal charge of adultery alleged to have been committed by or with the other, except that in proceedings for desertion and maintenance, and in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be a competent witness against the other, and except also that either of them shall be competent merely to prove the fact of marriage, in support of a criminal charge of adultery or bigamy alleged to have been committed by or with the other." Emphasis supplied.

the operation of the evidentiary inference comes directly into conflict with the common law and the Pennsylvania statutory rule on incompetency of spouses. As far as we have been able to ascertain the last time this Court considered this question was in *Commonwealth v. Weber*, 167 Pa. 153, 31 A. 481 (1895),[5] and the Court therein ruled it was proper for the counsel for the Commonwealth to argue to the jury it might infer that if called the wife's testimony would be adverse to her husband. We have reconsidered the question, and now rule it was improper for the district attorney and the trial judge to advise the jury it could draw an adverse inference from the defendant's failure to call his wife as a witness, thus, we overrule *Weber*. In so doing, we recognize there is a split of authority on this

---

This is a competency statute to be distinguished in purpose and effect from the rules governing privileges or confidential communications. See generally, Federal Rules of Evidence, 505 and 513.

[5] The *Weber* Court stated: "The first assignment is:—'The court erred in allowing counsel for commonwealth to comment on failure of defendant to call his wife as a witness.' The wife saw her husband kill her father; she was incompetent as a witness for the commonwealth, because she could not be called to testify against her husband; she was, however, a competent witness in his behalf; he could have called her to the stand; if his statement was true that he acted only in self-defense, and the pistol was discharged in a scuffle, without intent to kill, why did he not call her to corroborate him? Counsel for commonwealth argued, the fair inference was, her testimony would have contradicted her husband; this was not unwarranted comment; the force of it was for the jury; if she had been a competent witness for the commonwealth, and had not been called, it would have been allowable for defendant's counsel to have argued it was because her testimony would have contradicted Miller. There is, under the circumstances, no legal presumption raised by the refusal to call a competent witness; it is simply a fact for the consideration of the jury, entitled to such weight, as, in view of all the circumstances for the particular case, it ought, in their judgment to have." Id. at 161-62, 31 A. at 482.

question,[6] and a body of law which reaches a contrary conclusion to that reached herein; however, we view the rationale adopted today as the approach most consistent with the statutory law.

Our reason for so holding finds its genesis in the aforementioned statute. It is clear the purpose of the statute is to bar, either husband or wife, from testifying against the other, and this is a rule which is not waivable by the parties.[7] If the inference is allowed to operate, the whole purpose and effect of the statute would be negated. The statute by its very terms stops either spouse from adversely affecting a criminal case against the other; although it does allow a spouse to testify on behalf of the other. If the inference is allowed to operate, the very fact the spouse is not called adversely affects the other spouse. Thus, the protection which the legislature vested in the defendant-spouse would be completely eroded by the evidentiary inference. To hold otherwise, would be to give the spouse protection with one hand, and, at the same time take that protection away with the other.

Because of the foregoing ruling, we deem it unnecessary to reach the merit of the other asserted assignment of error.

---

[6] See generally Annot. 5 A.L.R. 2d 893 (1949).

[7] In *Canole v. Allen*, 222 Pa. 156, 70 A. 1053 (1908), the Court stated: "At common law husband and wife are incompetent to testify against each other. This rule has never been relaxed; on the contrary, it has been reinforced and guarded from invasion by statutory enactment. Our Act of May 23, 1887, P. L. 158, defining competency, is more than confirmatory of the common-law rule; it declares in express terms that neither shall be permitted to testify against the other, a prohibition of which both the parties to the suit and the trial judge as well, are bound to take notice. Connivance by the parties cannot evade it, nor can indulgence by the court. The language of the act is: 'Nor shall husband or wife be competent or permitted to testify against each other.' " Id. at 159, 70 A. at 1055.

Judgment reversed and a new trial is ordered.

Mr. Chief Justice JONES took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I disagree that the Court erred in allowing the inference here complained of, but if there was error, it was patently harmless. I therefore respectfully dissent. These points will be discussed in reverse order.

## I.

It will be useful to summarize the evidence in a bit more detail than does the Court. The homicide occurred in the living room of the home of the defendant-appellant, J. B. Moore. There were two Commonwealth witnesses. The first, a Robert Pritchett, testified that he accompanied his girl friend, Ernestine Kitt, to the Moore home where Miss Kitt had a hairdressing appointment with Mrs. J. B. Moore. He said that upon their arrival, Mrs. Moore began to arrange Miss Kitt's hair, working next to the stove in the kitchen, and that he, Pritchett, seated himself at the kitchen table just inside the doorway leading from the living room. A short time thereafter, Pritchett continued, a Benjamin Jones, the deceased, knocked at the front door, was admitted by Mrs. Moore, followed her back to the kitchen, greeted those present ("how is everyone doing?"), returned to the living room and took a seat. Pritchett then related that J. B. Moore, the defendant, apparently intoxicated, then entered the front door of his house, advanced towards Jones, raised a pistol, and shot Jones in the chest from a distance of one to two feet. Moore then walked toward Pritchett and mumbled, "What are you doing here?" As Moore walked on past Pritchett, Pritchett noticed that Moore's left hand was bleeding.

Pritchett, seizing the opportunity, grabbed the pistol and disarmed him.

Miss Kitt's testimony corroborated Pritchett's in all respects through the arrival of Jones. Not having had a view of the living room, she testified that she heard someone enter at the front, then heard a shot, ran into the living room with Mrs. Moore, passing Moore in the process, and discovered Jones, lying on the floor fatally wounded. She further related that Mrs. Moore asked her husband, "Why did you shoot Ben?", and he replied, "Because he shot me." Both Pritchett and Miss Kitt, however, heard only one shot. Defense counsel did not succeed on cross-examination in developing any line of impeachment of these two witnesses.

The defendant then testified. He said that he had taken the pistol from his car outside and intended to place it in the pocket of a coat hanging in the kitchen. While in the act of so doing, he related, Pritchett grabbed at the pistol, frightening Moore and causing him to jerk. The gun discharged, wounding Moore in the left hand. The defendant further testified that he was unaware at the time that Jones had been shot.

Mrs. Moore did not testify and was called by neither the Commonwealth nor the defendant. The Court, in its charge to the jury, gave an instruction which permitted the jury to infer, should they so desire, that had the defendant called his wife as a witness. her testimony would have been unfavorable to him.

It is clear that the jury rejected the defendant's account and accepted instead the account of the eyewitness Pritchett and of Ernestine Kitt. That account placed the defendant's wife in the kitchen at the time of the shooting and made her a witness to the same extent as was Miss Kitt. From the record it is manifest beyond doubt that it was the testimony of Pritchett and his girl friend that persuaded the jury that Moore

was a murderer; that being the case, then the jury had *direct* evidence of exactly what Mrs. Moore saw and did, and thus that she could *not* substantiate Moore's account of an accidental killing. I can only conclude, accordingly, that the instruction on a permissible adverse inference to be drawn from the failure of Moore to call his wife, when measured against the testimony of Pritchett and Miss Kitt, had nothing to do with this conviction. If allowance of the inference was error, as the Court holds, it was harmless by any standard.[1]

## II.

The Court's overruling of the decisions in *Commonwealth v. Weber*, 167 Pa. 153, 31 A. 481 (1895) and in *Commonwealth ex rel. Haines v. Banmiller*, 398 Pa. 7, 157 A. 2d 167 (1959),[2] is, I venture to say, an example of dubious law made worse. This problem of witness competency which on the surface seems quite simple nevertheless has a rather involved background which must be delineated if the matter is to be understood.

I begin with a definition of terms. A witness is "incompetent" or "disqualified" when his testimony is thought to have *no probative value* in establishing or refuting the issue at hand.[3] It was the common law

---

[1] Harmless beyond reasonable doubt is the standard under federal constitutional decisions. *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 23 L. Ed. 2d 284 (1969). The instant appeal, of course, does not involve error of constitutional dimension.

[2] The opinion of the Court does not cite *Commonwealth ex rel. Haines v. Banmiller*, 398 Pa. 7 (1959). The case is, however clearly on point and is necessarily overruled.

[3] J. Wigmore, 2 Wigmore on Evidence §475, at 516 (3d ed. 1940):

"In short, it is not every human assertion, as such, that is worth considering as the basis of an inference to the truth of the thing asserted; but only assertions made under certain conditions,—

rule that a wife was incompetent or disqualified to testify *for* her husband.[4] Although there have been various arguments advanced to support this rule, the conclusion reached in each was that the wife, because of her relationship to her husband, was not to be believed (i.e., her testimony was *as a matter of law* of no probative value, that is to say, irrelevant) when she testified *in her husband's behalf*.[5]

There also existed in the common law a rule that the wife could not be called to testify *against* her husband. While the origin of this rule is clouded in "tantalizing obscurity", 8 Wigmore §2227, at 211 (M'Naghten rev. 1961), it is clear that the reason for it could have had nothing to do with the *credibility* of the wife when called to testify *against* her husband. To the contrary, the fear was that she would be *all too truthful* and, in exposing her spouse's faults, would disrupt the tranquility and sanctity of the marriage. It is thus

---

these usually consisting in the presence of certain personal qualities or circumstances in [the witness]—i.e., his testimonial qualifications.

. . .

"If it is desired to express the doctrine of testimonial qualifications in terms of Relevancy, it may be thus stated: *The fact* that an assertion is made by a person who is sane, of age, experienced in the subject-matter, acquainted with the circumstances, and so forth, *is relevant* to show the truth of the fact asserted."

[4] This rule was first stated to be the existing law by Lord Coke, see Coke, A Commentarie upon Littleton 6b (1628), and was there said to be justified by the medieval phrase, *"quia sunt duae animae in carne una"* (husband and wife are two souls in the same body). As Wigmore says, "no one has ever thought it worth either defending or answering" this piece of fiction. 2 Wigmore §601, at 732 (3d ed. 1940).

[5] For a summary of the arguments and a criticism of each, see 2 Wigmore §601 (3d ed. 1940). Wigmore tells us that the rule of disqualification of the wife from testifying *for* her husband (as well as other rules of evidentiary disqualification) first came under meaningful attack in a treatise by Jeremy Bentham, see Bentham, 5 Rationale of Judicial Evidence 327, 339-45 (1827).

beyond doubt that this rule was not one of witness competency or disqualification, i.e., did not reflect a judicial belief that the testimony lacked *probative* value,[6] but was based on considerations of public policy. Only the rule barring *favorable* testimony was a rule of *disqualification*; the rule regarding *adverse* testimony was a rule of *privilege* of the other spouse.

The modern view of the law of evidence is that rules altogether disqualifying a witness are strongly disfavored; few people are, as a matter of practical experience, totally not to be believed. The rule barring a spouse from giving favorable testimony has therefore altogether disappeared. It was eliminated in Pennsylvania by the Act of May 23, 1887, P. L. 158, §1, 19 P.S. §681. The opposite rule, however, reflecting as it did a policy of privilege unrelated to competency, has proved more persistent.[7]

In the same Act of 1887, our Legislature enacted the following provisions, appearing in succession:

[19 P.S. §683]: "Nor shall husband and wife *be competent* or permitted to testify *against each other,* or

---

[6] 2 Wigmore §601, at 731 (3d ed. 1940): "In considering the reasons upon which the rule rests and the policy of altering it, the distinction must be kept in mind between the *incapacity* of the one spouse to testify *for* the other and the *privilege* not to testify *against* the other. This distinction warns us that we are here considering only the reasons for disqualifying them when voluntarily *coming forward in favor* of each other,—reasons quite independent of those affecting the privilege of not being compellable or allowable to testify against each other."

[7] For example, the rule regarding *favorable* testimony was overruled (for federal evidentiary purposes) in *Funk v. United States,* 290 U.S. 371, 78 L. Ed. 369 (1933), and yet the rule regarding compelled *adverse* spousal testimony was retained after examination in *Hawkins v. United States,* 358 U.S. 74, 3 L. Ed. 2d 125 (1958). The latter rule is perpetuated in the Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 505, 56 F.R.D. 183, 244 (November 21, 1972).

in support of a criminal charge of adultery alleged to have been committed by or with the other, except that in proceedings for desertion and maintenance, and in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be a competent witness against the other, and except also that either of them shall be competent merely to prove the fact of marriage, in support of a criminal charge of adultery or bigamy alleged to have been committed by or with the other." (Emphasis added). Act of 1887, §2(b).

[19 P.S. §684]: "Nor shall either husband or wife be competent or permitted to testify to confidential communications made by one to the other, unless this privilege be waived upon the trial." Act of 1887, §2(c). In light of the foregoing discussion, it is apparent that the Legislature of 1887 shared the rather common misunderstanding of the times and believed that the rule barring adverse testimony of a spouse was part and parcel of the rule barring favorable testimony.[8] If the language of section 2(b) of the Act of 1887 is to be taken literally, the rule barring adverse testimony was *altered* by the statute from one of privilege (which it was under the common law), founded on considerations of policy apart from credibility or relevance, into one of testimonial disqualification. In view of the fact that the statute of 1887 was enacted expressly *to abolish,* with certain exceptions, the common law rules of disqualification, it is unlikely in the extreme that the Legislature intended *to create* such a rule where none had previously existed. But this Court and the

---

[8] See 8 Wigmore §2227, at 211 (M'Naghten rev. 1961).

Superior Court have taken the Act quite literally. See, e.g., *Commonwealth v. Stots,* 436 Pa. 555, 261 A. 2d 577 (1970) ; *Ulrich's Case,* 267 Pa. 233, 109 A. 922 (1920) ; *Canole v. Allen,* 222 Pa. 156, 70 A. 1053 (1908); *Huffman v. Simmons,* 131 Pa. Superior Ct. 370, 200 A. 274 (1938), all of which hold that section 2(b) is a *competency* statute (i.e., is based on the theory that the spouse's testimony is not probative) and that therefore a husband cannot consent to his wife's testifying *against* him, that failure to object is "connivance", *Canole v. Allen,* supra, 222 Pa. at 159, and that an appellate court will notice such *sua sponte* and apply some notion of clear error. These cases are cited with approval by the Court in today's opinion.

Nevertheless, I doubt that the majority considers that section 2(b) of the Act of 1887 is a *real* competency statute. My grounds for so observing are simple. It is obviously illogical to suggest that an adverse inference can be taken from failure to call an incompetent (i.e., a legally incredible or irrelevant) witness. Certain lunatics are incompetent, as are convicted perjurers, and yet no one would seriously suggest that an adverse inference be permitted because the defendant failed to call a gibbering madman or a convicted perjurer. Since the reason that such testimony is not allowed is because it would not be probative if given, how can it be said to be inferentially probative when not given?[9] The majority, apparently realizing intuitively

---

[9] 8 Wigmore §2243, at 261 n.2 (M'Naghten rev. 1961) : "It may be added that the present question [adverse inference to be taken from failure to waive a privilege] must be distinguished from that which arises when the witness spouse is *disqualified* on the other's behalf and not merely privileged, because then it is impossible to use the testimony under any conditions and no inference could arise even if there were no privilege. This is an ordinary deduction from the general principle affecting such inferences, and the rulings have been already noted thereunder."

that the *probative value* of an inference taken from the failure to call the wife as a witness makes it impossible to approach the problem of her not testifying from the standpoint of *competency* (i.e., lack of probative value), instead addresses the matter in terms appropriate only to a question of evidentiary *privilege*.

In 1895 the Court decided the precise question answered by the majority today, *Commonwealth v. Weber*, 167 Pa. 153, 31 A. 481 (1895). There the Court unanimously approved prosecutorial comment on the failure of the defendant to call his wife—as here, an eyewitness to the crime and available as a witness on his behalf—to corroborate his claim that he killed in self-defense. In *Commonwealth ex rel. Haines v. Banmiller*, 398 Pa. 7, 157 A. 2d 167 (1959), the Court by unanimous per curiam decision affirmed, on the opinion of the lower court, a denial of habeas corpus. That lower court opinion, *Commonwealth ex rel. Haines v. Banmiller (No.2)*, 19 Pa. D. & C. 2d 219 (Cumberland Cnty 1959) (SHEELY, P. J.), holds that it is not error either for the Commonwealth to call the wife or for the Court to give the permissible inference instruction complained of here, citing *Commonwealth v. Weber*, supra, as controlling authority.

Viewed as a question of the permissibility of drawing an adverse inference from assertion of an evidentiary privilege, the issue has produced, as the majority recognizes, a split of authority.[10] Professor Wigmore himself found the opposing views to be equally reason-

[10] See Annot., 34 A.L.R. 3d 775 (1970) ("Propriety and prejudicial effect of comment or instruction by court with respect to party's refusal to permit introduction of privileged testimony") : "The question of the propriety of a court's instruction either affirming or denying the jury's right to draw an unfavorable inference against a party because the latter objected to the testimony of a witness on the ground of privileged communications is subject to conflicting views."

able, see 8 Wigmore §2243, at 260-61 (M'Naghten rev. 1961), and set forth the argument favoring the inference as follows: "there is no actual coercion and no actual denial of the privilege, but merely a dilemma and an option which are created not by any direct attempt to break into the privilege, but by the accidental coincidence, upon the same piece of testimony, of two independent principles of law [i.e., the adverse inference to be taken from failure to call a certain witness on the one hand, and the privilege to exclude such evidence, if unfavorable, on the other], neither of which should be made to yield rather than the other."

However, in light of the fact that our Legislature has not disturbed our interpretation of 1895, reaffirmed in 1959; in light of the fact that the statute of 1887, §2(b), and others like it have been widely and caustically criticized;[11] and in light of the fact that this Court has never accorded a broad treatment to the Act of 1887,[12] I think the proper decision today would have

---

[11] Prof. Wigmore's criticism of the "marital tranquility" justification is in my view unanswerable: "[T]he significance of the argument is that if Doe has committed a wrong against Roe and Doe's wife's testimony is needed for proving that wrong, Doe, the very wrongdoer, is to be licensed to withhold it and thus to secure immunity from giving redress because Doe's own marital peace will be thereby endangered—a curious piece of policy by which the wrongdoer's own interests are consulted in determining whether justice shall have its course against him. This alone, without further following into the details of the reasoning, will serve to exhibit that argument's fallacy." 8 Wigmore §2228, at 216-17 (M'Naghten rev. 1961).

The "marital harmony" argument (which underlies the Act of 1887, §2(b)) has been given short shrift by this Court when advanced as justification in civil contexts. See *Falco v. Pados*, 444 Pa. 372, 379-80, 282 A. 2d 351 (1971).

[12] See, e.g., *Commonwealth v. Wilkes*, 414 Pa. 246, 199 A. 2d 411 (1964) (which suggests that 19 P.S. §683 applies only to adverse testimony gained "through the [marital] relationship and in the confidence which that relationship inspires") (*Wilkes* confuses

been to hold the line. I certainly would not go out of my way to find in this statute a policy which was not apparent to the Court eight years after its enactment and which has been unasserted in the long interim by the General Assembly.

19 P.S. §683 with 19 P.S. §684—the privilege to bar confidential communications) and, if applied here, would require a contrary result to that reached by the Court) ; *Commonwealth v. Clanton,* 395 Pa. 521, 151 A. 2d 88 (1959) (holding that 19 P.S. §683 does not apply where the wife forgot to divorce her first husband).