491 A.2d 868

**COMMONWEALTH of Pennsylvania**

v.

**Robert EASLEY, Appellant.**

Superior Court of Pennsylvania.

Submitted March 23, 1984.

Filed April 4, 1985.

John H. Corbett, Jr., Public Defender, Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

Before POPOVICH, HOFFMAN and LIPEZ, JJ.

HOFFMAN, Judge:

Appellant contends that (1) the evidence was insufficient to prove the elements of the offense charged; (2) trial counsel was ineffective for failing to challenge the defective jury trial waiver colloquy; (3) trial counsel was ineffective for failing to object to the testimony of appellant's wife; and (4) the lower court erred in admitting into evidence a letter written by appellant's wife. We reverse.

On February 11, 1981, appellant and his wife were charged with fraudulently receiving public assistance payments totalling $5,958.50 because they failed to report to the Allegheny County Board of Assistance the income received from the wife's employment during the period of August 5, 1977 through June 27, 1979. Following a nonjury trial, both co-defendants were found guilty. Post-verdict motions were denied, and appellant was sentenced to a term of probation for one year plus restitution and costs. Subse-

quently, appellant, represented by new counsel, filed this appeal.

Appellant first challenges the sufficiency of the evidence to support his conviction. It is well-established that the evidence is sufficient if "viewing the evidence in the light most favorable to the Commonwealth, and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime had been established beyond a reasonable doubt." *Commonwealth v. Contakos*, 492 Pa. 465, 468, 424 A.2d 1284, 1286 (1981), *quoting Commonwealth v. Rose*, 463 Pa. 264, 267–68, 344 A.2d 824, 825–26 (1975). The elements of the offense in question are statutorily outlined as follows:

§ 481. False statements; investigations; penalty

(a) Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement or misrepresentation, or by impersonation or by wilfully failing to disclose a material fact regarding eligibility or other fraudulent means, secures, or attempts to secure, or aids or abets or attempts to aid or abet any person in securing assistance, or Federal food stamps, commits a crime which shall be graded as provided in subsection (b).

(b) any person violating subsection (2) commits the grade of crime determined from the following schedule:

| Amount of Assistance or Food Stamps | Degree of Crime |
| --- | --- |
| $3,000 or more | Felony of the third degree |
| $1,500 to $2,999 | Misdemeanor of the first degree |
| $1,000 to $1,499 | Misdemeanor of the second degree |
| $999 and under, or an attempt to commit any act prohibited in subsection (2) | Misdemeanor of the third degree |

Pursuant to 42 Pa.C.S. § 1515(a)(7) (relating to jurisdiction and venue), jurisdiction over cases graded a misdemeanor of the third degree under this section shall be vested in district justices.

62 P.S. § 481 (Supp.1984–85).

■ Here, the record reveals the following facts: Periodic interviews were conducted by the social workers from the Department of Public Welfare. At these interviews which were held on August 5, 1977, May 31, 1978, September 20, 1978, and March 14, 1979, appellant, in his wife's presence, stated that neither of them was receiving any income. Additionally, both parties indicated that they had been living together during the applicable period. It is undisputed that, during this time, appellant's wife was employed by Allegheny County. Because appellant failed to disclose the material fact that his wife was employed, we find that the evidence was sufficient to convict appellant.

Appellant next alleges that trial counsel was ineffective in failing to challenge his jury waiver colloquy. "[C]ounsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable basis* designed to effectuate his client's interest." *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349, 352 (1967) (emphasis in original). However, we must first determine whether the issue underlying the charge of ineffectiveness possesses arguable merit before we inquire into the basis for counsel's decision. *Commonwealth v. Evans*, 489 Pa. 85, 91, 413 A.2d 1025, 1028 (1980). "Counsel cannot be found ineffective for failing to assert a meritless claim." *Id.*, 489 Pa. at 91 n. 6, 413 A.2d at 1028 n. 6.

In the instant case, the lower court questioned appellant as to his understanding of (1) his right to be tried by a jury of twelve people, (2) his right to participate in the selection of the jury, (3) the area from which the jury pool would be chosen, and (4) his right to challenge peremptorily five of those jurors and any other jurors for cause. (N.T. July 23, 1981 at 5–7). The court also asked appellant whether he had discussed in advance with his attorney his right to waive a jury trial, whether anyone had pressured him into waiving, and whether he had consumed any alcoholic beverages or narcotics within the last 24 hours. (*Id.* at 8–10). In

response to further questioning, appellant indicated that he wished to be tried without a jury and that his decision to waive a jury trial was made of his own free will. (*Id.* at 8–9). Appellant also signed, in the presence of counsel, a written waiver of his right to a jury trial. (*Id.* at 10–11). Upon completing the colloquy, the lower court accepted appellant's waiver and commenced hearing the case as a nonjury case.

Appellant argues specifically that the above-described colloquy was defective because the court failed to inform him that he would be waiving his right to a unanimous verdict. In *Commonwealth v. Williams*, 454 Pa. 368, 312 A.2d 597 (1973), our Supreme Court stated that the "essential ingredients, basic to the concept of a jury trial, are the requirements that the jury be chosen from members of the community (a jury of one's peers), that the verdict be unanimous, and that the accused be allowed to participate in the selection of the jury panel." *Id.*, 454 Pa. at 373, 312 A.2d at 600. Subsequently, in *Commonwealth v. Ward*, 483 Pa. 53, 394 A.2d 535 (1978), and *Commonwealth v. Greene*, 483 Pa. 195, 394 A.2d 978 (1978), because the trial court in those cases failed to inform the defendant that the verdict of the jury had to be unanimous in order to convict, the Supreme Court found that the defendant had not effectively waived his right to a jury trial. However, in *Commonwealth v. Smith*, 498 Pa. 661, 450 A.2d 973 (1982), although the judge conducting the colloquy did not explore the defendant's understanding of either the fact that the jury's verdict had to be unanimous or the fact that the defendant could participate in jury selection, our Supreme Court found that the defendant was fully aware of these requirements because he had signed a written waiver form which stated that he " 'fully understand[s]' the ingredients of a jury trial, including the unanimity and defendant participation requirements which were not explained in the colloquy." *Id.*, 498 Pa. at 663, 450 A.2d at 974. Therefore, the Court concluded that trial counsel was not ineffective for failing to object to the defective colloquy.

We find *Smith* distinguishable from the instant case. Here, the waiver form signed by appellant stated only that he waived his right to a jury trial and elected to be tried by a judge without a jury. (N.T. July 23, 1981 at 10–11). There is no indication in the colloquy, waiver form, or anywhere in the record that appellant was ever informed of or understood his right to a unanimous verdict.[1]

The Commonwealth correctly points out that a "totality of the circumstances" approach has been adopted by our courts in reviewing an allegedly defective guilty plea colloquy. *See Commonwealth v. Shaffer*, 498 Pa. 342, 446 A.2d 591 (1982); *Commonwealth v. Campbell*, 309 Pa.Superior 214, 455 A.2d 126 (1983). In *Commonwealth v. Anthony*, 307 Pa.Superior 312, 453 A.2d 600 (1982), *aff'd*, 504 Pa. 551, 475 A.2d 1303 (1984), this Court found that, although the guilty plea colloquy between the trial court and the defendant did not include any mention of the need for a unanimous verdict in order to convict, the colloquy was not defective because the record revealed that the plea tendered was knowing, intelligent and voluntary. On appeal, the Supreme Court agreed.

1. We also find *Commonwealth v. Ponder*, 323 Pa.Superior 566, 471 A.2d 89 (1984), and *Commonwealth v. Quarles*, 310 Pa.Superior 74, 456 A.2d 188 (1983), distinguishable. In *Ponder*, the defendant alleged that the jury waiver colloquy was defective because it did not mention *how* he would participate in jury selection or his right to challenge jurors. However, the colloquy did inform appellant that he would be allowed to participate in jury selection and was complete in all other respects. This Court, in holding that there was a knowing and intelligent waiver of the right to trial by jury, stated: "There was no requirement that the trial court give appellant a play-by-play description of the procedure to be followed in selecting a jury." 323 Pa.Superior at 571, 471 A.2d at 92. In *Quarles*, this Court held that the jury trial waiver was not defective even though appellant was not informed that the jury must find him guilty beyond a reasonable doubt. We reasoned that the defendant, in waiving his right to be tried by a jury, was not thereby waiving any rights regarding burden of proof because the judge would be bound by the same legal principles that would bind a jury in this respect. 310 Pa.Superior at 79, 456 A.2d at 191. We also reaffirmed that the only essential ingredients which a defendant must be advised of are that the jury would be chosen from his community, that the verdict must be unanimous, and that a defendant can participate in the selection of the jury panel. *Id., citing Commonwealth v. Pollard*, 288 Pa.Superior 20, 430 A.2d 1192 (1982).

Additionally, the totality of the circumstances test has apparently been extended to jury waiver colloquies as well. *See Commonwealth v. DeGeorge*, 506 Pa. 445, 485 A.2d 1089 (1984). In *DeGeorge*, there was no on-the-record colloquy, and the written waiver, signed by the defendant, only stated that the defendant "pleads not guilty and ... waives a jury trial and elects to be tried by a judge without a jury." *Id.*, 506 Pa. at 449, 485 A.2d at 1091. Therefore, our Supreme Court remanded the case to the trial court for evidentiary proceedings to determine whether the waiver of trial by jury was knowing and intelligent. The Court reasoned that:

> In the absence of any assertion of record indicating that the waiver was knowing and intelligent, we are unable to determine whether DeGeorge has received effective assistance of counsel in waiving a jury trial. We have no indication of the extent to which counsel and client may have conferred on that which was waived, or what colloquy was conducted at the time the written waiver was executed.

*Id.*, 506 Pa. at 449–450, 485 A.2d at 1091. We note that the Supreme Court rejected the *Morin* remedy of remanding for a new trial. *See Commonwealth v. Morin*, 477 Pa. 80, 383 A.2d 832 (1978). The *DeGeorge* Court noted that decisions subsequent to *Morin* "permit[ted] the consideration of circumstances outside the content of the of-record colloquy in determining the validity of a [jury trial] waiver." 506 Pa. at 449–450, 485 A.2d at 1091, *citing Commonwealth v. Anthony, supra; Commonwealth v. Carson*, 503 Pa. 369, 469 A.2d 599 (1983);[2] *Commonwealth v. Smith, supra; Commonwealth v. Williams, supra.*

2. In *Commonwealth v. Carson, supra* our Supreme Court held that counsel was not ineffective in failing to explain that the jury would be chosen from members of the community or from the defendant's peers, and therefore affirmed the denial of post-conviction relief. The Court concurred with the lower courts' determination, based on the record of the colloquy and testimony taken at the post-conviction hearing from the defendant and his trial counsel, that the defendant "fully understood the ingredients of a jury trial and his rights thereto,

■ In the instant case, even applying the totality of the circumstances test to look at the entire record, rather than just the on-the-record colloquy, we find that there is no evidence to indicate that appellant understood *all* of the essential ingredients of a jury trial, *i.e.* that the verdict must be unanimous in order to convict.

■ Accordingly, we remand the case to the lower court for evidentiary proceedings to determine whether the waiver of trial by jury was knowing and intelligent. *Commonwealth v. DeGeorge, supra.* If, on remand, the court finds that the waiver was knowing and intelligent, then appellant will have suffered no prejudice and therefore will not be entitled to a new trial on ineffectiveness grounds. *See Commonwealth v. Garvin,* 335 Pa.Superior 560, 485 A.2d 36 (1984) (en banc). However, if the court finds that the waiver was unknowing and unintelligent, then appellant will be entitled to a new trial.[3]

Judgment of sentence reversed and case remanded for proceedings consistent with this opinion. Jurisdiction is not retained.

POPOVICH, J., files a concurring and dissenting opinion.

and made a knowing and intelligent waiver of those rights." 503 Pa. at 372, 469 A.2d at 600.

We find *Carson* distinguishable from the instant case because, here, it does not appear elsewhere in the record that appellant understood that he had a right to a unanimous verdict and therefore knowingly and intelligently waived that right.

**3.** Because of our disposition of this case, we need not address appellant's remaining contentions.

We add only that a new trial is not warranted just because a letter written by appellant's wife, which implicated appellant, was admitted into evidence. Instead, we believe that 42 Pa.C.S.A. § 5913 is inapplicable to a defendant-spouse who is testifying on his or her own behalf even though such testimony has an adverse effect on the other spouse's interests. Here, appellant and his wife were brought to trial as co-defendants on the criminal charge of fraudulently receiving public assistance payments and, during the course of the trial, the wife took the stand in her own defense. Regardless of whether such testimony implicated appellant, we think that she was so entitled to defend herself. *See Ebner v. Ewiak,* 335 Pa.Superior 372, 484 A.2d 180 (1984).

POPOVICH, Judge, concurring and dissenting:

This writer agrees with the majority's decision to reverse the judgment. However, an evidentiary hearing need not be conducted at the trial level because the record shows that appellant is entitled to a new trial because the trial court erred in admitting into evidence a letter which was written by appellant's wife which implicated appellant.

The record shows that at trial the following letter was mentioned and introduced into evidence during the testimony of Mary Salerno, an investigator and supervisor of the Department of Public Welfare:

"Dear Ms. Salerno, Supervisor, I'm writing this letter to inform you of my inability to keep the appointment scheduled for Monday, February 2, 1981, at nine. I have laryngitis. If I called you to explain, you probably would have thought it a prank call since I could hardly talk clearly. I can't apologize enough for any inconvenience I may have caused. I understand your time is valuable and limited. I would like to explain or clarify my involvement in this case, whether it be directly or indirectly.

Yes, it was an overpayment made to the both of us during this period of May 14, 1976 to February, 1979. To my knowledge, we did not receive any additional funds from D.P.A. Our worker, Ms. Gay, called in February and talked to me regarding my status, that we would not receive any further assistance because her records indicated an employment record under my name. I have been employed since April 26, 1976, with Allegheny County Adult Services, Area Agency on Aging. I was wedded at the age of 17, July 20, 1974, and gave birth, November 18, '74. I was also still in school. I graduated and furthered my education in business school and the secretarial school. We had been on D.P.A. since we were married in 1974. I didn't like the fact we were on D.P.A., but we had no alternative because Robert didn't complete high school, and I was in high school at that time and couldn't get a job without a diploma or G.E.D. I went on

to business school so I could qualify for a good paying job. I did just that.

Although, I was getting $175 bi-monthly, I felt it enough to take care of all three of us. During our four and a half years of marriage, because we were separated since June, 1979, we have encountered many marital problems which in turn created physical, mental, emotional, and sexual problems on my part since I was the target of his insecurity and frustrations.

After nine months of our marriage, Robert changed drastically. I could not [sic] longer talk to him."

I don't know if that is relevant. I will skip down. I'm going to delete certain portions of it when on the face, it indicates what has to do with their personal relationship unconnected with the funds. I see no purpose with reading it. There is no point in my reading it myself there. Page 3 and 4, we are omitting. I'm not interested in pages 5, 6, 7. I'm not going to incorporate some of the personal matters referred to in the letter. There is no point to that. Obviously, they refer to the fact they were aware of the fact she was working and performing satisfactorily with the County and didn't need the extra money.

MR. MATLOCK [The Wife's Attorney]: Also, your Honor, part of our defense is in there as far as the duress is concerned. (N.T. 7/23/81 at 111–114).

The prosecution contends that the admission of the letter was not an error because "the references to appellant in the letter cannot be considered prejudicial in light of the crime charged." Brief for Appellee at 21. The prosecution also states that the "letter, as edited, was properly admitted." *Id.* This writer must disagree.

In Pennsylvania, two rules govern the admission of testimony by one spouse against the other. *See Commonwealth v. Borris*, 247 Pa.Super. 260, 263–6, 372 A.2d 451, 453–4 (1977). The scope of these rules has been delineated in the following manner:

The first is an absolute prohibition of incompetence preventing one spouse from testifying against the other during the existence of a valid marriage. See *Canole v. Allen,* 222 Pa. 156, 70 A. 1053 (1908); *Bell v. Throop,* 140 Pa. 641, 21 A. 408 (1891); III Freedman, Law of Marriage and Divorce in Pennsylvania, § 749 (2d Ed.1957). That principle has long been codified into the law of Pennsylvania. Act of May 23, 1887, P.L. 158, § 5, cls. (b, c); 28 P.S. §§ 316–317; Act of May 23, 1887, supra, as amended, Act of April 27, 1909, P.L. 179, § 1; Act of May 11, 1911, P.L. 269, § 1; 19 P.S. § 683. See also, *Commonwealth v. Moore,* 453 Pa. 302, 309 A.2d 569 (1973). The second privilege governs confidential communications made during a marriage, subsequently terminated by death or divorce. The Act of 1887 does not contemplate those situations. See 2 Henry, Pennsylvania Evidence § 699 (4th Ed.1953). Our courts have followed the common law rule in those cases: "We have held that the reason for the rule of the common law, which forbade husband and wife to give testimony against each other, ceased on the death or divorce of one of the parties, except as to confidential communications. *Hayes's Est.,* 23 Pa.Super. 570. The disqualification that remains after the dissolution of the marriage is restricted to communications of a confidential nature. *Stewart v. F.A. North Co.,* 65 Pa. Super. 195." *Commonwealth v. Beddick,* 180 Pa.Super. 221, 227, 119 A.2d 590, 593 (1956). See generally, McCormick, Evidence, § 66 (Cleary Ed.1972).

*Id. Accord* 42 Pa.C.S.A. § 5913; *Trammel v. United States,* 445 U.S. 40, 48 n. 9, 100 S.Ct. 906, 911 n. 9, 63 L.Ed.2d 186, 193 n. 9 (1980).

The incompetency statute reads as follows:

**§ 5913. Spouses as witnesses against each other**

Except as otherwise provided in this subchapter, in a criminal proceeding *husband and wife shall not be competent or permitted to testify against each other,* except that in proceedings for desertion and maintenance, and in any criminal proceeding against either for bodily injury or

violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be a competent witness against the other, and except also that either of them shall be competent merely to prove the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other. (Emphasis added). 42 Pa.C. S.A. § 5913.

Our Supreme Court also has said that the rule prohibiting one spouse from testifying against the other "is a rule which is not waivable by the parties." *Commonwealth v. Moore*, 453 Pa. 302, 307, 309 A.2d 569, 571 (1973). The genesis of the law in Pennsylvania was summarized in the following manner:

At common law husband and wife are incompetent to testify against each other. This rule has never been relaxed; on the contrary, it has been reinforced, and guarded from invasion by statutory enactment. Our Act of May 23, 1887 (P.L. 158), defining competency, is more than confirmatory of the common-law rule; *it declares in express terms that neither shall be permitted to testify against the other, a prohibition of which both the parties to the suit and the trial judge as well are bound to take notice.* Connivance by the parties cannot evade it, nor can indulgence by the court. The language of the act is: "Nor shall husband or wife be competent or permitted to testify against each other."

*Canole v. Allen*, 222 Pa. 156, 159, 70 A. 1053, 1055 (1908).[1] (Emphasis added)

---

1. The origin of the privilege was summarized recently by the Supreme Court of the United States in the following manner:

The privilege claimed by petitioner has ancient roots. Writing in 1628, Lord Coke observed that "it hath beene resolved by the Justices that a wife cannot be produced either against or for her husband." 1 E. Coke, A Commentarie upon Littleton 6b (1628). See, generally, 8 J. Wigmore, Evidence § 2227 (McNaughton rev. 1961). This spousal disqualification sprang from two canons of medieval jurisprudence: first, the rule that an accused was not

Thus, the law is clear that the testimony of Sandra Easley could not be introduced against her husband, the appellant. In this case, it is immaterial that the testimony was in the form of an extrajudicial written statement because we recognize that

> [w]hat is prohibited by the act is testimony in any form by the wife or husband against the other. Extrajudicial admissions are a sort of testimony; hence the prohibition of the act applies to them with the same force as though made by a spouse from the stand. Wigmore, Ev. 3rd Ed., §§ 1048, 2232.

*Kerr v. Clements,* 148 Pa.Super. 378, 383, 25 A.2d 737, 740 (1942).[2]

> permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife.
>
> Despite its medieval origins, this rule of spousal disqualification remained intact in most common-law jurisdictions well into the 19th century. See *id.,* § 2333. It was applied by this Court in *Stein v. Bowman,* 13 Pet. 209, 220–223, 10 L.Ed. 129 (1839), in *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893), and again in *Jin Fuey Moy v. United States,* 254 U.S. 189, 195, 41 S.Ct. 98, 101, 65 L.Ed. 214 (1920), where it was deemed so well established a proposition as to "hardly requir[e] mention." Indeed, it was not until 1933, in *Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, that this Court abolished the testimonial disqualification in the federal courts, so as to permit the spouse of a defendant to testify in the defendant's behalf. *Funk,* however, left undisturbed the rule that either spouse could prevent the other from giving adverse testimony. *Id.,* at 373, 54 S.Ct., at 212. The rule thus evolved into one of privilege rather than one of absolute disqualification. See J. Maguire, Evidence, Common Sense and Common Law 78–92 (1947).
>
> *Trammel v. United States,* 445 U.S. at 44, 100 S.Ct. at 909, 63 L.Ed.2d at 190 (1980).

**2.** The exceptions to the incompetency rule also are inapplicable to the instant case because this proceeding is not a "criminal proceeding against either for bodily injury or violence attempted" or against the children or "in support of criminal charge of bigamy." 42 Pa.C.S.A. § 5913. Additionally, this case does not involve "a crime committed against a third person when such crime occurs in the *same criminal episode* as an act of violence committed by the accused upon the spouse." *Commonwealth v. Galloway,* 271 Pa.Super. 305, 312, 413

Therefore, because the trial court erred in admitting the letter over appellant's objection, it is necessary to analyze whether this error was harmless.

The standard of review for determining harmless error has been set forth in the following manner:

an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a " 'reasonable possibility' " that an error " 'might have contributed to the conviction,' " the error is not harmless. *Commonwealth v. Davis*, 452 Pa. [171] at 178, 305 A.2d [715] at 719 [1973], quoting *Chapman v. California*, 386 U.S. [18] at 24, 87 S.Ct. [824] at 828 [17 L.Ed.2d 705 (1967)].

*Commonwealth v. Story*, 476 Pa. 391, 409, 383 A.2d 155, 164 (1978).

Additionally, because the trial court and not the jury was the fact finder at appellant's trial, a judge, as factfinder, is presumed to disregard inadmissible evidence and consider only competent evidence. *Commonwealth v. Brown*, 328 Pa.Super. 215, 219 n. 6, 476 A.2d 969, 971 n. 6 (1984). The reason for this rule is because

Judges, however, by virtue of their legal training and professional experience can be expected to sift through the evidence, critically analyze it, and discard that which is not properly presented. As a result, an appellate court can more readily presume proper decision making when the trier of fact is a judge.

*Commonwealth v. Walls*, 272 Pa.Super. 284, 289, 415 A.2d 890, 893 (1979).

In cases where potentially prejudicial evidence has been admitted during the course of a trial in which the trial court is the finder of fact, this Court has "deduced two factors which will be weighty considerations in determining whether a mistrial should be declared...." *Id.* These factors

A.2d 418, 421 (1979) (emphasis added). Similarly, this case does not present a situation where appellant attacked the character of his wife and where she rebutted the testimony *for* the Commonwealth. *See* 42 Pa.C.S.A. § 5915. *See generally Cornelius, supra,* at 498–502.

also are relevant to our examination of the issue presented in this case:

The first factor is whether the evidence is "so prejudicial" that the risk of improper adjudication cannot be ignored; such evidence is usually recognizable by its emotional impact rather than its misleading probative value. The second factor is whether the prejudicial evidence is important to the case; that is to say, when the other evidence of guilt is overwhelming, "we shall be less sensitive to the risk of harmful prejudice...." [*Commonwealth v. Conti*, 236 Pa.Super. 488, 501, 345 A.2d 238, 245 (1975)].

*Id.*

Applying the harmless test to the facts of the instant case, this writer is unable to conclude that the error could not have contributed to the verdict. To begin with, the inadmissible testimony was an admission by the appellant's wife, a co-defendant, that "it was an overpayment made to the *both* of us during this period of May 14, 1976, to February, 1979." Notes of Testimony at 111 (emphasis added). Appellant was charged with illegally receiving public assistance "on or about August 5, 1977 thru June 27, 1979", which was during the same period. *See* "Complaint".

Additionally, appellant's wife admitted that she had "been employed since April 26, 1976, with Allegheny County Adult Services, Area Agency on Aging." *Id.* at 112. Sarah Easley also stated that she "was the target of [appellant's] insecurity and frustrations". *Id.* at 113.

Accordingly, because appellant's wife's statement was against appellant and also because the statement referred to appellant's involvement in the crime, this evidence is the kind of evidence which is recognizable "by its *emotional* impact rather than its misleading probative value." *Commonwealth v. Walls*, 272 Pa.Super. at 289, 415 A.2d at 893 (emphasis added); *see Commonwealth v. Garrison*, 398 Pa. 47, 51, 157 A.2d 75, 77 (1959) (no error where the evidence proffered at trial "was not against her husband and did not refer to him).

In fact, the reason for the rule which disqualifies one spouse from testifying against the other presumes the existence of an emotional relationship.[3]

**3.** The Supreme Court of the United States has criticized the breadth of an incompetency rule which absolutely bars the admission of testimony by one spouse against the other when that Court said the following:

> Its protection is not limited to confidential communications; rather it permits an accused to exclude all adverse spousal testimony. As Jeremy Bentham observed more than a century and a half ago, such a privilege goes far beyond making "every man's house his castle," and permits a person to convert his house into "a den of thieves." 5 Rationale of Judicial Evidence 340 (1827). It "secures, to every man, one safe and unquestionable and every ready accomplice for every imaginable crime." *Id.*, at 338.

> The ancient foundations for so sweeping a privilege have long since disappeared. Nowhere in the common-law world—indeed in any modern society—is a woman regarded as chattel or demeaned by denial of a separate legal identity and the dignity associated with recognition as a whole human being. Chip by chip, over the years those archaic notions have been cast aside so that "[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas." *Stanton v. Stanton*, 421 U.S. 7, 14–15, 95 S.Ct. 1373, 1377–1378, 43 L.Ed.2d 688 (1975).

> The contemporary justification for affording an accused such a privilege is also unpersuasive. When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probable little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.[*] Indeed, there is reason to believe that vesting the privilege in the accused could actually undermine the marital relationship. For example, in a case such as this the Government is unlikely to offer a wife immunity and lenient treatment if it knows that her husband can prevent her from giving adverse testimony. If the Government is dissuaded from making such an offer, the privilege can have the untoward effect of permitting one spouse to escape justice at the expense of the other. It hardly seems conducive to the preservation of the marital relation to place a wife in jeopardy solely by virtue of her husband's control over her testimony.

> Our consideration of the foundations for the privilege and its history satisfy us that "reason and experience" no longer justify so sweeping a rule as that found acceptable by the Court in *Hawkins.* Accordingly, we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying. This modification—vesting the privilege in the witness-spouse—furthers the important public interest in

The prosecution cites Federal authority for support regarding the admissibility of the letter. However, that authority is not persuasive because the rules are different. *See Trammel v. United States,* 445 U.S. at 480 n. 9, 100 S.Ct. at 911 n. 9, 63 L.Ed.2d at 193 n. 9 (Pennsylvania is one of "[e]ight states [which] provide that one spouse is incompetent to testify against the other in a criminal proceeding...."); *Id.* at 53, 100 S.Ct. at 914, 63 L.Ed.2d at 196 (Under the federal law, "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying."). *See generally* Cornelius, *supra.* Thus, we are persuaded that the error could have contributed to the verdict.

The second factor is whether the inadmissible evidence was important to the case. Although social workers testified that the Easleys had received public assistance and failed to report any income, this writer is unable to state that the letter was not an important part of the case.

Even the prosecutor conceded as much at the close of the trial when he said:

MR. TURNER [the Prosecutor]: Yes, your Honor, I think that the evidence clearly establishes that Saundra Easley with full knowledge was employed and receiving assistance through this period of time in question. Whether or not the Court will give any weight or significance to her other comments is certainly within the Court's discretion. That with regard to Saundra Easley, I think we have well met our burden of establishing that

marital harmony without unduly burdening legitimate law enforcement needs.

[*] It is argued that abolishing the privilege will permit the Government to come between husband and wife, pitting one against the other. That, too, misses the mark. Neither *Hawkins,* nor any other privilege, prevents the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testimony in the courtroom that is prohibited.

*Trammel v. United States,* 445 U.S. at 52, 100 S.Ct. at 913–914.

she is guilty of making false statements beyond a reasonable doubt.

*I think that the more difficult situation arises with regard to Robert Easley.* I think the Court could accept during this period of time that the two parties resided together as husband and wife, and he had knowledge of the fact they were receiving assistance, first from the interviews conducted by the various witnesses that testified, from the fact that checks were made to him that he cashed, and he knew from these interviews and checks and statements contained therein as well as things explained to him that he had the duty and obligation to report to the Department of Welfare any change in their circumstances; most notably, any source of income they might be receiving. I would reiterate to the Court that I think common sense would leave the Court to believe that Robert Easley was well aware of the fact that his wife was working during this period of time.

I would ask the Court to consider the daily routine involved and it would be hard for him not to be aware of the fact she was working at this time. Yet no efforts were made by either party to inform Welfare of the other sources of income.

As to the question whether she was in fact under duress, there is unsubstantiated testimony that he beat her and she was under mental duress and pain and so forth. There is no supporting evidence to establish that she at any time went to the police officers about it or attempted to leave the home for the safety of herself or her child; nor, she at any time reported this information to the Department of Welfare. I think if either thing had been done, some solution could have been found that would have prevented this matter from going this far. I would go back to the charge presented here, that of making false statements; the charge brought against both parties and the facts relevant to that charge. With that, the Commonwealth would rest, your Honor. (Notes of Testimony at 138–141 (emphasis added).

In its opinion, the trial court referred to the inadmissible statement as "unflattering"; however, the court stated that the statement was "neither inculpatory, inflamatory [sic] or prejudicial." Trial Court's Opinion at 1.

While this writer is mindful of the trial court's ability to sift through the evidence, this writer cannot overlook "the fact that judges are subject to the same emotions and human frailties as affect all persons, lay jurors or not." *Commonwealth v. Conti*, 236 Pa.Super. at 501, 345 A.2d at 245 (1975). Moreover, "no matter which way the evidence[, the letter,] was taken, it cast a shadow on the whole case." *Id.*

The error in the instant case was compounded because appellant's co-defendant testified on her own behalf as follows:

[The Wife's Attorney]

Q You told Mr. Romano [a social worker] you were not working?

[The Wife]

A Yes.

Q Why did you tell him that?

A I can't sit here and really explain the reason why I did or didn't. First of all, everyone here has to understand the intensity of the fear that I had to live with with Robert Easley during my marriage. I had no family to turn to. I had nowhere else to go. *Therefore, I had no alternative but to stay and listen to what he said and to take the abuse he gave me during those years of my marriage. I had no way out and I was getting sick and tired of being badgered and abused constantly by him. Until I found a way out, I submitted to everything he wanted me to do until I found a way out.*

Q Are you saying things happened in September, '78 and March, '79 when you spoke to Miss Gay [a social worker], the same things happened?

A Yes.

Q   Did this physical or mental abuse ever lead to you having to go to the hospital at all?

A   Yes, I had a bruise on my arm. My head was busted open. I have bruises here. I have bruises on my back and my arm.

Q   Did this only revolve around you getting this assistance from the Department of Public Welfare?

A   *Not only that, anything. He was totally unreasonable. No matter what I wanted to do, he had his own mind. I said curtly one day, "You're going to get caught." He said, "I will take care of that." When he told them he was working, I said, "Why can't I tell them I'm working?" Because the checks are coming in my name. They won't worry about your employment. I said, "You told them you were working." It is total confusion.*

Q   You said that the checks were coming in his name. Did you ever cash any of the checks?

A   No, I did not. The money I work for I took care of myself and my baby and paid the bills.

Q   Which bills?

A   Sometimes I would pay the rent. It depends on whether or not he paid it or not. He was always home at the time. Depending on whether or not he paid the receipt made up the difference as to whether or not I would pay it. If he didn't pay it, I paid it.

Q   You took care of your daughter totally?

A   Totally except for food because we were receiving food stamps. Medically, under our checks, we also had medical coverage. That aspect I didn't take care of her. As far as food and clothing, I took care of her and any other supports she needed, I provided her with that.

Q   On a regular basis, would you say you had the use of the money that came from the checks?

A   No, I didn't even see the checks.

Q   At any time did you accompany Mr. Easley to the bank with the checks?

A   *No, I was working at the time. He would cash the checks. He would do whatever he wanted to. One time Fon [the daughter] and I lived on cereal for a whole month because he wanted to get a car.*

Q   You stated you had been to the hospital on several occasions?

A   Yes.

MR. MATLOCK [Appellant's Attorney]: I have some hospital records, Your Honor.

THE COURT: What is this?

MR. MATLOCK: This is a hospital report.

BY MR. MATLOCK:

Q   During this time how many times would you say you went to the hospital, Mrs. Easley, a rough estimate?

A   For not only physical abuse, but for internal abuse, I was treated at Magee Hospital at least three times a year. Homestead Hospital at least three or four times at Homestead Hospital.

Q   What about South Hills?

A   That is Homestead Hospital.

Q   Why were you at Homestead Hospital?

A   For a cut on my arm. One day he had come in. He was going to school at the time to get his G.E.D. He was receiving all kinds of calls. I would question him because this one time this one girl called and said, "Is Curly there?" I said, "No, he isn't." "What time will he be home?" I said, "Who is this?" She wouldn't give me an answer. I said, "I don't know what time."

When he came in, I said, "Some girl called for you. She was rude and ignorant over the telephone. What does she want? She wanted to speak to you." I said, "How can you have girls call at the house?" He was drinking at the time. He had a whiskey glass, or whatever kind of bar glass he had. He was sitting on the couch. I must have said something to him about the phone call that really made him upset. He was on the couch and I was on the chair. I put my hand up like this (indicating) because he was going to throw

something at me. I had a deep cut here because my bone was showing, and I was rushed to the hospital.

MR. NYCHIS: Your Honor, I move for a mistrial. I object to this. I ask for a mistrial. This is highly prejudicial and inflammatory. I don't know how you can permit it.

THE COURT: The motion for a mistrial is denied. I mean you have gone far enough on this.

MR. MATLOCK: Your Honor, this stretched over two years. I'm trying to show a continuing set of circumstances between these two people.

Notes of Testimony at 127–131 (emphasis added).

The totality of the circumstances in the instant case establishes that the prejudicial evidence which was emphasized at trial deprived appellant of a fair trial, and accordingly, a new trial should be granted.